Nos. 24-50627, 24-40533, 24-10855

# In the United States Court of Appeals for the Fifth Circuit

SPACE EXPLORATION TECHNOLOGIES CORP.,

*Plaintiff-Appellee*,

v.

NATIONAL LABOR RELATIONS BOARD, a federal administrative agency, JENNIFER ABRUZZO, in her official capacity as the General Counsel of the National Labor Relations Board, LAUREN M. MCFERRAN, in her official capacity as the Chairman of the National Labor Relations Board, MARVIN E. KAPLAN, GWYNNE A. WILCOX, and DAVID M. PROUTY, in their official capacities as Board Members of the National Labor Relations Board, and JOHN DOE in his official capacity as an Administrative Law Judge of the National Labor Relations Board,

*Defendants-Appellants.*

consolidated with

ENERGY TRANSFER L.P. and its subsidiary and employing entity LA GRANGE ACQUISITION, L.P.,

*Plaintiffs-Appellees*,

v.

NATIONAL LABOR RELATIONS BOARD, a federal administrative agency, JENNIFER ABRUZZO, in her official capacity as the General Counsel of the National Labor Relations Board, LAUREN M. MCFERRAN, in her official capacity as the Chairman of the National Labor Relations Board, MARVIN E. KAPLAN, GWYNNE A. WILCOX, and DAVID M. PROUTY, in their official capacities as Board Members of the National Labor Relations Board, and JOHN DOE in his official capacity as an Administrative Law Judge of the National Labor Relations Board,

*Defendants-Appellants.*

consolidated with

AUNT BERTHA, doing business as FINDHELP,

*Plaintiff-Appellee*,

v.

NATIONAL LABOR RELATIONS BOARD, a federal administrative agency,

JENNIFER ABRUZZO, in her official capacity as the General Counsel of the National Labor Relations Board, LAUREN M. MCFERRAN, in her official capacity as the Chairman of the National Labor Relations Board, MARVIN E. KAPLAN, GWYNNE A. WILCOX, and DAVID M. PROUTY, in their official capacities as Board Members of the National Labor Relations Board, and JOHN DOE in his official capacity as an Administrative Law Judge of the National Labor Relations Board,

*Defendants-Appellants.*

---

*On Appeal from the United States District Courts*
*for the Northern, Southern, and Western Districts of Texas*

---

**BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER AS**
***AMICUS CURIAE* IN SUPPORT OF DEFENDANTS-APPELLANTS**

---

Elizabeth B. Wydra
Brianne J. Gorod
Brian R. Frazelle
Margaret Hassel*
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

* Not admitted in D.C.; supervised
by principals of the firm

*Counsel for Amicus Curiae*

**SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS**

Pursuant to Fifth Circuit Rule 29.2, I hereby certify that I am aware of no persons or entities, besides those listed in the party briefs, that have a financial interest in the outcome of this litigation.  In addition, I hereby certify that I am aware of no persons with any interest in the outcome of this litigation other than the signatories to this brief and their counsel, and those identified in the party and *amicus* briefs filed in this case.

Dated: November 4, 2024                    */s/ Brianne J. Gorod*
                                            Brianne J. Gorod

                                            *Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus curiae* states that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

# TABLE OF CONTENTS

**Page**

SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS.................. i

CORPORATE DISCLOSURE STATEMENT ................................................. ii

TABLE OF CONTENTS.................................................................................. iii

TABLE OF AUTHORITIES ........................................................................... iv

INTEREST OF *AMICUS CURIAE*..................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................. 1

ARGUMENT ..................................................................................................... 6

    I.    Removal Protections for the Leaders of Multimember Expert
          Agencies Like the NLRB Are Constitutional ...................................... 6

          A.    *Seila Law* Rested on a Distinction Between Multimember
                  Independent Agencies and Single-Director Independent
                  Agencies ...................................................................................... 6

          B.    The NLRB Fits Within the *Humphrey's Executor* Exception
                  to the President's Removal Power ........................................... 8

          C.    The NLRB Has None of the Features *Seila Law* Identified as
                  Constitutionally Problematic..................................................... 11

    II.    Established Practice Places the Validity the NLRB's Removal
          Protections Beyond Doubt.................................................................... 20

CONCLUSION................................................................................................. 26

CERTIFICATE OF SERVICE ........................................................................ 1A

CERTIFICATE OF COMPLIANCE............................................................... 2A

# TABLE OF AUTHORITIES

**Page(s)**

<u>CASES</u>

*City of Arlington v. FCC*,
569 U.S. 290 (2013)...................................................................... 5, 24

*Collins v. Yellen*,
594 U.S. 220 (2021)...................................................................... 5, 7-9

*Consumers' Rsch. v. CPSC*,
91 F.4th 342 (5th Cir. 2024) ........................................... 2, 3, 5, 8, 9, 17, 18, 20

*Consumers' Rsch. v. CPSC*,
2024 WL 4529808 (2024)........................................................... 2

*Exela Enter. Sols., Inc. v. NLRB*,
32 F.4th 436 (5th Cir. 2022)........................................... 10, 11, 14, 16

*Free Enter. Fund v. PCAOB*,
561 U.S. 477 (2010)................................................... 6, 7, 17, 18, 25

*FTC v. Klesner*,
25 F.2d 524 (D.C. Cir. 1928) .................................................... 9

*Humphrey's Ex'r v. United States*,
295 U.S. 602 (1935) ................................................... 2, 4, 9, 13, 18, 24

*Illumina, Inc. v. FTC*,
88 F.4th 1036 (5th Cir. 2023).................................................... 2, 6

*McCulloch v. Maryland*,
17 U.S. 316 (1819)...................................................................... 22

*McPherson v. Blacker*,
146 U.S. 1 (1892)........................................................................ 22

*Mistretta v. United States*,
488 U.S. 361 (1989)..................................................................... 21, 26

*Morrison v. Olson*,
487 U.S. 654 (1988)..................................................................... 18, 24

iv

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

*NLRB v. Noel Canning*,
573 U.S. 513 (2014) ........................................................... 4, 21, 22

*The Pocket Veto Case*,
279 U.S. 655 (1929) ................................................................. 21

*Seila Law LLC v. CFPB*,
591 U.S. 197 (2020) ............................................. 2, 3, 5-8, 11, 12, 14-21, 24, 25

*Stuart v. Laird*,
5 U.S. 299 (1803) ................................................................. 22, 25

*United States v. Curtiss-Wright Exp. Corp.*,
299 U.S. 304 (1936) ................................................................. 24

*United States v. Midwest Oil Co.*,
236 U.S. 459 (1915) ................................................................. 21

*Va. Off. for Prot. & Advoc. v. Stewart*,
563 U.S. 247 (2011) ................................................................. 12

*Wiener v. United States*,
357 U.S. 349 (1958) ................................................................. 24

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) ................................................................. 21, 26

*Zivotofsky v. Kerry*,
576 U.S. 1 (2015) ................................................................. 4, 21

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. II, § 1, cl. 1 ........................................................ 5

## STATUTES AND LEGISLATIVE MATERIALS

Act of Mar. 2, 1889, ch. 382, 25 Stat. 855 ................................... 23

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

An Act to Create a Federal Trade Commission, ch. 311, 38 Stat. 717
(1914) .................................................................................................. 9, 10

An Act to Regulate Commerce, ch. 104, 24 Stat. 379 (1887) .............. 1, 12, 22, 23

Federal Power Act, ch. 285, 41 Stat. 1063 (1920)..................................... 13

Hearing on S. 195 Before the S. Comm. on Educ. & Lab., 74th Cong.
(1935) .................................................................................................. 19, 20

National Labor Relations Act, ch. 372, 49 Stat. 449 (1935)....................... 4, 13

5 U.S.C. § 7104(a) ...................................................................................... 14

5 U.S.C. § 7104(f) ....................................................................................... 14

5 U.S.C. § 7119(c) ....................................................................................... 14

12 U.S.C. § 241 ............................................................................................ 14

15 U.S.C. § 41 ........................................................................................ 12, 14

15 U.S.C. § 45 ............................................................................................... 9

15 U.S.C. § 2055(b)(3)(B) ............................................................................ 8

15 U.S.C. § 2071(a) .................................................................................... 5, 8

15 U.S.C. § 2076(b)(7)................................................................................ 5, 8

28 U.S.C. § 596(a)(1)................................................................................... 18

29 U.S.C. § 153 ....................................................................................... 15, 16

29 U.S.C. § 175a(d) ..................................................................................... 16

42 U.S.C. § 2000e ....................................................................................... 13

42 U.S.C. § 7193 ......................................................................................... 13

47 U.S.C. § 154 ........................................................................................... 14

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

52 U.S.C. § 20923(a)(1)................................................................ 14

52 U.S.C. § 20923(a)(2)................................................................ 14

## BOOKS, ARTICLES, AND OTHER AUTHORITIES

Appellant's Opening Br., *Space Expl. Techs., Corp. v. NLRB*, No. 24-40315
(5th Cir. filed July 17, 2024).................................................... 10

Appellant's Reply Br., *Space Expl. Techs., Corp. v. NLRB*, No. 24-40315
(5th Cir. filed Oct. 7, 2024)...................................................... 10

Marshall J. Breger & Gary J. Edles, *Established by Practice: The
Theory and Operation of Independent Federal Agencies*, 52 Admin.
L. Rev. 1111 (2000) ................................................................. 23

Br. for Court-Appointed Amicus Curiae, *Seila Law v. CFPB*, 591 U.S.
197 (No. 19-7).......................................................................... 15

Letter from James Madison to Spencer Roane (Sept. 2, 1819) ................. 22

David E. Lewis & Jennifer L. Selin, *Political Control and the Forms of
Agency Independence*, 83 Geo. Wash. L. Rev. 1487 (2015)................... 13

White House Historical Association, *When Was Electricity First Installed
at the White House?*, https://www.whitehousehistory.org/questions/in-
what-year-was-electricity-installed-in-the-white-house ........................ 1

# INTEREST OF *AMICUS CURIAE*[1]

Constitutional Accountability Center is a think tank and public interest law firm dedicated to fulfilling the progressive promise of the Constitution's text and history.  CAC works to improve understanding of the Constitution and accordingly has an interest in this case.  Although this Court may resolve these appeals based on other grounds, *amicus* submits this brief to demonstrate why, if the Court reaches the issue, it should reject SpaceX's claim that the National Labor Relations Board Members' removal protections violate the Constitution.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Congress has been creating multimember independent agencies like the NLRB for most of the nation's history—they have been part of the executive branch for longer than the light bulb.[2]  Nearly a century of Supreme Court precedent affirms their constitutionality.  Relying on that precedent, Congress has

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than *amicus* or its counsel made a monetary contribution to its preparation or submission.  All parties have consented to the filing of this brief.

[2] *Compare* An Act to Regulate Commerce, ch. 104, § 11, 24 Stat. 379, 383 (1887) (establishing Interstate Commerce Commission), *with* White House Historical Association, *When Was Electricity First Installed at the White House?*, https://www.whitehousehistory.org/questions/in-what-year-was-electricity-installed-in-the-white-house (electricity installed at White House and at State, War, and Navy Building in 1891).

established dozens of multimember agencies wielding substantial executive power whose leaders are removable only for cause.

In *Seila Law LLC v. CFPB*, 591 U.S. 197 (2020), the Supreme Court addressed "a new situation" involving an "almost wholly unprecedented" independent agency led "by a single individual." *Id.* at 238, 220, 213. Making clear that it was not "revisit[ing] [its] prior decisions," the Court found "compelling reasons not to extend those precedents to the novel context of an independent agency led by a single Director." *Id.* at 204. As this Court has explained, the Consumer Financial Protection Bureau's single-director structure was the "defining feature" that made its removal provision unconstitutional. *Consumers' Rsch. v. CPSC*, 91 F.4th 342, 354 (5th Cir. 2024), *cert. denied*, No. 23-1323, 2024 WL 4529808 (mem.) (2024).

Nevertheless, the district court drew distinctions between the multimember NLRB and the multimember Federal Trade Commission, upheld in *Humphrey's Executor v. United States*, 295 U.S. 602, 631-32 (1935), and the multimember Consumer Product Safety Commission, upheld in *Consumers' Research*, 91 F.4th at 351-52. But these are distinctions without a difference. Because the Supreme Court has "expressly declined to overrule" the *Humphrey's Executor* decision, *Illumina, Inc. v. FTC*, 88 F.4th 1036, 1047 (5th Cir. 2023), that decision "still protects *any* traditional independent agency headed by a multimember board,"

*Consumers' Rsch.*, 91 F.4th at 352 (emphasis added). In other words, the bright-line rule is that the Constitution permits "expert agencies led by a *group* of principal officers removable by the President only for good cause." *Seila Law*, 591 U.S. at 204.

In *Seila Law*, the Court held that single-director independent agencies are distinguishable from "a traditional independent agency, run by a multimember board," *id.* at 205-06, in three respects. These three differences were critical to the Court's holding. First, the Court wrote, such agencies are "an innovation with no foothold in history or tradition." *Id.* at 222. Second, the Court concluded that a single-director structure is a greater imposition on presidential oversight, "foreclos[ing] certain indirect methods of Presidential control." *Id.* at 225. Third, the Court concluded that empowering a single director with "no colleagues to persuade" impermissibly "clashes with constitutional structure by concentrating power in a unilateral actor." *Id.* at 225, 204; *see also Consumers' Rsch.*, 91 F.4th at 354-55 (confirming the centrality of these three factors).

None of those distinguishing features describes the NLRB—a prototypical multimember body that resembles agencies dating back 150 years in every constitutionally significant way. The NLRB bears all the hallmarks of a traditional independent agency: it has multiple members with staggered terms, avoiding the concentration of power that so troubled the Court in *Seila Law* while allowing

3

every President to influence the Board's composition and policies. Indeed, Congress established the NLRB less than two months after *Humphrey's Executor* affirmed the legitimacy of this agency structure. *Compare Humphrey's Ex'r v. United States*, 295 U.S. 602 (1935) (decided May 27, 1935), *with* National Labor Relations Act, ch. 372, 49 Stat. 449 (1935) (signed July 5, 1935). To the extent the Board differs at all from other agencies, those differences do not affect the President's executive oversight.

Even if *Seila Law* were not so definitive about what made the CFPB Director's removal protection unconstitutional, SpaceX's arguments concerning the removability of Board Members would still be foreclosed by established practice, which has long settled the constitutional legitimacy of multimember independent agencies like the NLRB.

In separation-of-powers cases, the judiciary places "significant weight upon historical practice," *Zivotofsky v. Kerry*, 576 U.S. 1, 23 (2015) (quotation marks omitted) (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 524 (2014)), because it embodies "the compromises and working arrangements that the elected branches of Government themselves have reached," *Noel Canning*, 573 U.S. at 525-26. Multimember independent agencies have wielded substantial executive power, including prosecutorial power, for generations. And the Supreme Court has consistently affirmed their constitutionality—right up to its recognition in *Seila*

*Law* that Congress could amend the constitutional defects of the CFPB, "an independent agency that wields significant executive power," by "converting [it] into a multimember agency." 591 U.S. at 204, 237.

The NLRB cannot be distinguished from other multimember regulatory agencies. All these agencies wield the Constitution's "executive Power" as that concept is understood today, *City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013) (quoting U.S. Const. art. II, § 1, cl. 1); *see also Consumers' Rsch.*, 91 F.4th at 353-54 (concluding that the CPSC wields "substantial" executive power), and many wield the same "prosecutorial power" cited by the district court, S-ROA.326. *See, e.g.*, 15 U.S.C. § 2071(a) (allowing the CPSC to seek injunctions); *id.* § 2076(b)(7)(B) (allowing the CPSC to "prosecute . . . through its own legal representative . . . any criminal action . . . for the purpose of enforcing the laws subject to its jurisdiction").

Moreover, "the nature and breadth of an agency's authority is not dispositive in determining whether Congress may limit the President's power to remove its head." *Collins v. Yellen*, 594 U.S. 220, 251-52 (2021); *see id.* at 253 ("Courts are not well-suited to weigh the relative importance of the regulatory and enforcement authority of disparate agencies, and we do not think that the constitutionality of removal restrictions hinges on such an inquiry.").

In *Seila Law*, as in *Free Enterprise Fund v. PCAOB*, 561 U.S. 477 (2010), the Supreme Court confronted a "new situation," *id.* at 483, and prohibited "*additional* restrictions on the President's removal authority" that have "no foothold in history or tradition," *Seila Law*, 591 U.S. at 228, 222 (emphasis added). It did not license lower courts to strike down a time-honored structure the Court has consistently upheld—that of a "traditional independent agency headed by a multimember board or commission." *Id.* at 207. Whether to revisit that longstanding precedent is a question "for the Supreme Court, not [this Court], to answer." *Illumina*, 88 F.4th at 1047.

## ARGUMENT

### I. Removal Protections for the Leaders of Multimember Expert Agencies Like the NLRB Are Constitutional.

#### A. *Seila Law* Rested on a Distinction Between Multimember Independent Agencies and Single-Director Independent Agencies.

*Seila Law* could hardly have been clearer: "We hold that the CFPB's leadership *by a single individual* removable only for inefficiency, neglect, or malfeasance violates the separation of powers." *Seila Law*, 591 U.S. at 213 (emphasis added). "Instead of placing the agency under the leadership of a board with multiple members," Congress "deviated from the structure of nearly every other independent administrative agency in our history." *Id.* at 203. "The question

before us," the Court said, "is whether *this arrangement* violates the Constitution's separation of powers." *Id.* (emphasis added).

According to the Court, the President's Article II authority "includes the ability to remove executive officials," but there are "exceptions" to this rule. *Id.* at 213, 204. One exception was first recognized in *Humphrey's Executor*, holding "that Congress could create expert agencies led by a *group* of principal officers removable by the President only for good cause." *Seila Law*, 591 U.S. at 204.

In *Seila Law*, the Court was "asked to extend these precedents to a new configuration: an independent agency that wields significant executive power *and is run by a single individual*." *Id.* (emphasis added). In refusing to broaden its precedent, the Court was clear that "we need not and do not revisit our prior decisions allowing certain limitations on the President's removal power." *Id.* Rather, the Court declined "to extend those precedents to the 'new situation' before us," *id.* at 220 (quoting *Free Enter. Fund*, 561 U.S. at 483), which introduced a "novel impediment" to presidential authority, *id.* at 215; *accord Free Enter. Fund*, 561 U.S. at 483-84 (striking down the "new situation" of "multilevel protection from removal," but declining "to reexamine any . . . precedents").

If any doubt remained, *Collins v. Yellen* eliminated it. In that challenge to the single-director Federal Housing Finance Agency, the Court concluded that "[a] straightforward application of our reasoning in *Seila Law* dictates the result." 594

U.S. at 251. That straightforward application was simple: "The FHFA (like the CFPB) is an agency led by a single Director, and the Recovery Act (like the Dodd-Frank Act) restricts the President's removal power." *Id.* In *Collins*, the Court reiterated that in *Seila Law*, "[w]e did not revisit our prior decisions allowing certain limitations on the President's removal power, but we found compelling reasons not to extend those precedents to the novel context of an independent agency led by a single Director." *Id.* at 250-51 (quotation marks omitted).

*Consumers' Research* further confirms that *Seila Law* did not undermine removal protections for multimember agencies, even those that wield "substantial executive power." *Consumers' Rsch.*, 91 F.4th at 353. As this Court explained, *Humphrey's Executor* "still protects *any* traditional independent agency headed by a multimember board." *Id.* at 352 (emphasis added) (quotation marks omitted).

## B. The NLRB Fits Within the *Humphrey's Executor* Exception to the President's Removal Power.

Given the clarity of *Consumers' Research*, SpaceX has been forced to grasp at straws, attempting to single out "prosecutorial" power as uniquely "executive" and therefore outside the reach of *Humphrey's Executor*. The district court appeared to agree, citing the NLRB's ability to seek injunctions in federal court. *See* S-ROA.326. But SpaceX's distinction is false, and the CPSC—at issue in *Consumers' Research*—can likewise seek injunctions. *See* 15 U.S.C. §§ 2055(b)(3)(B), 2071(a). Indeed, the CPSC is able to "prosecute" civil actions

"in the name of the Commission" and to "prosecute" criminal actions "for the purpose of enforcing the laws subject to its jurisdiction." *Id.* § 2076(b)(7). *Consumers' Research* did not find this significant but instead reaffirmed the reasoning of *Seila Law* and *Collins*: removal protections do not hinge on "the nature and breadth of an agency's authority." *Collins*, 594 U.S. at 224. Rather, the "defining feature" of the CFPB and the FHFA that doomed their removal provisions was their leadership by a single director, which impeded presidential oversight. *Consumers' Rsch.*, 91 F.4th at 354.

The NLRB's injunction power closely resembles the prosecutorial, injunction-seeking authority of dozens of independent agencies dating back 150 years. As *Humphrey's Executor* acknowledged, the FTC in 1935 was "empowered and directed to prevent persons, partnerships, or corporations . . . from using unfair methods of competition." 295 U.S. at 620 (quoting 15 U.S.C. § 45). To accomplish that mission, the FTC could charge private parties with using unfair methods of competition, adjudicate those charges in administrative hearings, issue cease-and-desist orders, and—notably here—enforce those orders in court. *See id.* at 620-21; An Act to Create a Federal Trade Commission, ch. 311, § 5, 38 Stat. 717, 719-20 (1914) ("If [a] person . . . fails . . . to obey such order of the commission . . . , the commission may apply to the circuit court of appeals of the United States."); *see also FTC v. Klesner*, 25 F.2d 524, 524 (D.C. Cir. 1928) ("The

Federal Trade Commission filed its petition in this court for an injunction to enforce an order of the Commission.").[3]

The district court's ruling draws no support from *Exela Enterprise Solutions, Inc. v. NLRB*, 32 F.4th 436 (5th Cir. 2022), which simply interpreted the NLRA and held that it does not protect the General Counsel from removal at will, refusing to read unwritten removal protections into the statute. Rejecting the odd notion that *Humphrey's Executor* somehow required the General Counsel to enjoy removal protection, *see id.* at 444, this Court observed that the General Counsel differs from the FTC Commissioners in *Humphrey's Executor* because the General Counsel's position is "core to the executive function." *Id.*

According to the district court, this passing comment implies that NLRB Board Members must be removable at will, because they exercise some of the same "executive prosecutorial power" as the General Counsel. S-ROA.326. But to the extent *Exela* sheds any light here at all, its observations are in line with

---

[3] In another case currently before this Court, SpaceX claimed that the FTC could not seek injunctions at the time of *Humphrey's Executor*, *see* Appellant's Opening Br. 20 n.5, *Space Expl. Techs., Corp. v. NLRB*, No. 24-40315 (5th Cir. filed July 17, 2024), but SpaceX overlooked the agency's clear authority to go directly to court to enforce its cease-and-desist orders, *see* 38 Stat. at 719-20. When this mistake was pointed out, SpaceX simply responded, without elaboration, that the NLRB's injunction-seeking powers are "qualitatively" different, *see* Appellant's Reply Br. 7 n.2, *Space Expl. Techs.*, No. 24-40315 (5th Cir. filed Oct. 7, 2024), implausibly suggesting that the NLRB's ability to seek *preliminary* injunctive relief is somehow greater than the FTC's ability in 1935 to seek *permanent* injunctive relief.

*Consumers' Research*.  Instead of placing dispositive weight on the label used to characterize an officer's power—"significant," "substantial," "core," etc.—this Court echoed *Seila Law* by emphasizing the structural difference between a multimember board and the single-person Office of General Counsel.  Removal protections for the latter would unduly hinder presidential control: "our implication of for-cause removal protections insulating the General Counsel's quintessentially prosecutorial function may 'mean[ ] an unlucky President might get elected on [a labor-rights] platform and enter office only to find [himself] saddled with a holdover Director from a competing political party who is dead set *against* that agenda.'"  *Exela*, 32 F.4th at 445 (quoting *Seila Law*, 591 U.S. at 225).

## C.     The NLRB Has None of the Features *Seila Law* Identified as Constitutionally Problematic.

As discussed above, the Supreme Court and this Court have held that removal protections are permissible for multimember agencies wielding substantial executive power.  Although the district court tried to distinguish the NLRB from other such agencies, these distinctions do not hold water.  The combination of a tenure-protected Board with a removable-at-will General Counsel, while uncommon, does not introduce any novel separation-of-powers concerns or create any new impediments to presidential control.  And the omission of "inefficiency" as a ground for removal of Board Members is constitutionally insignificant.

*Seila Law* discussed three aspects of single-director leadership that it concluded made removal limits untenable in that context: removal protection for single directors was a historical anomaly, 591 U.S. at 220-23; it encroached on the President's faithful execution of the law, *id.* at 204; and it concentrated power in the hands of one person, *id.*  None of those factors exist here.  In all constitutionally significant ways, the NLRB is identical to hosts of other multimember agencies that have long enjoyed removal protections.

### 1. Historical Anomaly

*Seila Law* stressed that "[t]he CFPB's single-Director structure is an innovation with no foothold in history or tradition" that was "almost wholly unprecedented."  *Id.* at 220-22.  This "lack of historical precedent" suggested a "constitutional problem."  *Id.* at 220 (quotation marks omitted); *see Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 260 (2011) (novelty "is often the consequence of past constitutional doubts").

Multimember independent agencies are not novel.  Dating back to the establishment of the Interstate Commerce Commission in 1887, members of expert boards have enjoyed removal protection.  *See* Act to Regulate Commerce, § 11, 24 Stat. at 383.  And the NLRB bears all the hallmarks of these traditional agencies.  *Compare id.* (establishing the ICC with five Commissioners, serving six-year terms, removable for cause), *with* 15 U.S.C. § 41 (establishing the NLRB with five

Members, serving five-year terms, removable for cause). Indeed, Congress created the NLRB less than two months after the Supreme Court upheld the model of an expert, multimember body with removal protections. *Compare Humphrey's Ex'r*, 295 U.S. 602 (1935) (decided May 27, 1935), *with* National Labor Relations Act, ch. 372, 49 Stat. 449 (1935) (signed July 5, 1935).

The district court concluded that the role of the NLRB's General Counsel somehow deprives the agency of historical pedigree, S-ROA.326, but that argument is unavailing. Not only is the NLRB's structure itself nearly a century old, but Congress has long utilized similarly minor variations in structuring other agencies. *See* David E. Lewis & Jennifer L. Selin, *Political Control and the Forms of Agency Independence*, 83 Geo. Wash. L. Rev. 1487, 1508 (2015). For instance, the Federal Energy Regulatory Commission reviews remedial enforcement orders issued by the Secretary of Energy; relies upon a single, removable officer to bring cases before it; and collaborates with that officer to enforce its orders in court. *See* 42 U.S.C. § 7193(a)-(c).[4] Conversely, the Equal Employment Opportunity Commission directs a General Counsel who is responsible for litigating cases *on behalf of* the EEOC. *Id.* § 2000e(a)-(b). And at the Federal Labor Relations Authority, the removable-at-will General Counsel, the tenure-protected Board

---

[4] This structure dates back to the creation of FERC's predecessor, the Federal Power Commission, in 1920. *See* Federal Power Act, ch. 285, § 20, 41 Stat. 1063, 1073 (1920).

13

Members, and the tenure-protected Federal Service Impasses Panel all play complementary roles.  *See* 5 U.S.C. §§ 7104(a), (f), 7119(c).

Indeed, the multimember boards and commissions are themselves structured in a variety of ways.  For instance, some boards require partisan splits (Federal Trade Commission, 15 U.S.C. § 41); others do not (Federal Reserve Board, 12 U.S.C. § 241).  Some allow the President to nominate freely (Federal Communications Commission, 47 U.S.C. § 154); others require the President to consider suggestions from members of Congress (Election Assistance Commission, 52 U.S.C. § 20923(a)(2)).  Independent boards range in size from four members (Election Assistance Commission, *id.* § 20923(a)(1)), to seven members (Federal Reserve Board, 12 U.S.C. § 241).  What makes an agency's structure constitutionally problematic is not that it looks somewhat different from the structures of other agencies, but that its distinct characteristics impede presidential oversight.  *See Seila Law*, 591 U.S. at 215.

Moreover, the NLRB's General Counsel and its Board Members each have dozens of historical analogs.  The General Counsel is an officer who serves at the will of the President, *Exela*, 32 F.4th at 441-42, and thus resembles the prototypical singular officer, like the Secretary of Transportation or any other cabinet member.  The Board itself has the structure of a prototypical independent agency: power is shared among multiple members with staggered terms, giving each President the

14

opportunity to appoint members, and the President can further influence the Board by appointing its chairperson and by dismissing members for cause. 29 U.S.C. § 153. Uniting these two historically validated constitutional structures in one agency does not negate their historical pedigrees. Nor does it introduce any novel impediments to presidential oversight, as discussed below.

### 2. *Encroachment on Presidential Oversight*

*Seila Law* concluded that, for agency heads who serve alone, removal protections intrude on presidential authority more than protections for members of boards or commissions. 591 U.S. at 204, 216-20. Although the CFPB's defenders argued that a single-director independent agency is just as accountable to the President as a multimember agency, *see, e.g.*, Br. for Court-Appointed Amicus Curiae 44-46, *Seila Law*, 591 U.S. 197 (No. 19-7), the Court disagreed, holding that a single-director structure "forecloses certain indirect methods of Presidential control" available to influence multimember bodies, *Seila Law*, 591 U.S. at 225.

"Because the CFPB is headed by a single Director with a five-year term," a President could spend much of her term unable to remove a director holding diametrically opposed views. *Id.* And "the agency's single-Director structure means the President will not have the opportunity to appoint any other leaders [of the agency] . . . who can serve as a check on the Director's authority and help bring the agency in line with the President's preferred policies." *Id.* Indeed, "some

15

Presidents may not have any opportunity to shape its leadership and thereby influence its activities," because they will "*never*" be able to appoint a director. *Id.*

The Court noted that additional features rendered the CFPB "even more problematic." *Id.* at 225. For instance, the agency's independent funding deprived the President of the opportunity to influence the CFPB through the appropriations process. *Id.*

None of these concerns applies to the NLRB. With five Board Members serving staggered terms, regular vacancies allow every President to shape the agency's leadership and agenda through appointments. *See* 29 U.S.C. § 153(a). Since the NLRB's creation in 1935, moreover, the President has appointed the chairperson of the Board. *Id.* The NLRB receives funding through the annual appropriations process, *id.* § 175a(d), allowing Presidents to exercise control through their involvement in that process. And the President has a *further* check on the NLRB because the President can remove the General Counsel at will. *See id.* § 153(d); *Exela*, 32 F.4th at 441-42. In short, the NLRB's structure involves no "innovative intrusions on Article II." *Seila Law*, 591 U.S. at 228. The Court struck down the CFPB Director's removal protection not simply because it was *novel*, but because it created a "novel *impediment* to the President's oversight of the Executive Branch." *Id.* at 215 (emphasis added).

The district court noted that NLRB Members are removable only for malfeasance in office and neglect of duty, not for "inefficiency." S-ROA.326. But this Court upheld precisely the same removal restriction in *Consumers' Research*. *See* 91 F.4th at 346. And the Supreme Court has never rested its removal decisions on a parsing of the variations in language among different "for cause" removal provisions. Nor has it suggested that the presence or absence of "inefficiency" as a ground for removal could make a constitutional difference.

In *Free Enterprise Fund*, the Court noted the exceptionally "rigorous" standard for removing the officers at issue, but the decision did not turn on that standard. Instead, it rested on how two stacked layers of good-cause tenure— "double for-cause" protection, *Free Enter. Fund*, 561 U.S. at 488—stymied presidential control. *See id.* at 496 ("This novel structure does not merely add to the Board's independence, but transforms it."); *Seila Law*, 591 U.S. at 215 (explaining that "an official insulated by *two* layers of for-cause removal protection" represented a "novel impediment to the President's oversight").

The significance of for-cause removal protections under Article II is that they prevent the President from "remov[ing] an officer based on disagreements about agency policy." *Seila Law*, 591 U.S. at 229. That is equally true whether or not the President may remove that officer for inefficiency. Nothing in Supreme Court precedent suggests that if it is constitutionally permissible to make an officer

removable for "inefficiency, neglect of duty, or malfeasance in office," *Humphrey's Ex'r*, 295 U.S. at 620, it could be constitutionally impermissible to make that same officer removable only for "neglect of duty, or malfeasance in office."  Indeed, the Court has upheld removal provisions that simply referred to "good cause," *Morrison v. Olson*, 487 U.S. 654, 663 (1988) (quoting 28 U.S.C. § 596(a)(1)), without further specification.

After all, as *Seila Law* explained, the President may not remove officers for "inefficiency" simply because they disagree with the President's policies.  591 U.S. at 229-31.  So even if the NLRA allowed removal of Board Members for "inefficiency," the President still would not be completely "responsible for the[ir] actions."  *Id.* at 224 (quoting *Free Enter. Fund*, 561 U.S. at 496-97).  It is implausible that such a slight variation in the terms of a for-cause removal provision pushes the constitutionally validated *Humphrey's Executor* exception over the line into violating Article II.  *Cf. Consumers' Rsch.*, 91 F.4th at 356 (endorsing the "simple rule" that "[p]rincipal officers may retain for-cause protection when they act as part of an expert board").

### 3.  *Concentration of Power in a Single Person*

The third feature of the CFPB's structure on which *Seila Law* rested was its consolidation of power in "a unilateral actor insulated from Presidential control."  591 U.S. at 204.  According to the Court, this configuration has "no place in our

constitutional structure." *Id.* at 220. With "the sole exception of the Presidency, that structure scrupulously avoids concentrating power in the hands of any single individual." *Id.* at 222-23. The Framers' "constitutional strategy," in a nutshell, was to "divide power everywhere except for the Presidency, and render the President directly accountable to the people." *Id.* at 224.

"The CFPB's single-Director structure," however, "contravene[d] this carefully calibrated system by vesting significant governmental power in the hands of a single individual." *Id.* "With no colleagues to persuade," this individual could "unilaterally" wield a range of enforcement, adjudicatory, and rulemaking authorities. *Id.* at 225.

The Court found this arrangement a far cry from the "multimember body of experts" it previously had approved. *Id.* at 216. But the NLRB matches that traditional profile. Modeled on the independent agencies that preceded it, such as the ICC and the FTC, the NLRB was structured with power divided among multiple Board Members who would balance each other's authority. *See* Hearing on S. 195 Before the S. Comm. on Educ. & Lab., 74th Cong. 138 (1935) (statement of Sen. La Follette) (discussing the benefits of having longer, staggered terms); *id.* at 64-65 (arguing that this feature would deter abrupt changes in policy and make the Board more judicial in nature). Congress created this body of experts precisely because "[t]he law permitting self-organization and collective

bargaining raises numerous problems, economic, social, and legal, which require expert knowledge and special training." *Id.* at 95 (statement of Francis Biddle, NLRB).

In contrast, the CFPB Director had no "peers" to share his authority or to temper his decisions. *Seila Law*, 591 U.S. at 203. The Court held that "*this arrangement* violates the Constitution's separation of powers." *Id.* (emphasis added). The same cannot be said of "a traditional independent agency, run by a multimember board with a diverse set of viewpoints and experiences." *Id.* at 205-06 (quotation marks omitted).

\* \* \*

In sum, conditioning the removal of NLRB Board Members on good cause presents none of the constitutional defects identified in *Seila Law*. As this Court held in *Consumers' Research*, the *Seila Law* decision applies only to single-director agencies. And there is no meaningful distinction between the NLRB and the other multimember independent agencies that have long wielded substantial executive power.

## II.    Established Practice Places the Validity the NLRB's Removal Provision Beyond Doubt.

Even if it were not so clear that "*Seila Law's* holding . . . reach[es] only 'single-Director' agencies," *Consumers' Rsch.*, 91 F.4th at 354, established practice

20

has long settled the legitimacy of removal protections for multimember agencies like the NLRB.

The flip side of the Supreme Court's suspicion of "novel governmental structures," *Seila Law*, 591 U.S. at 231, is that "'traditional ways of conducting government . . . give meaning' to the Constitution," *Mistretta v. United States*, 488 U.S. 361, 401 (1989) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610 (1952) (Frankfurter, J., concurring)).  For that reason, the Court "put[s] significant weight upon historical practice" in separation-of-powers cases. *Zivotofsky*, 576 U.S. at 23 (quotation marks omitted); *see The Pocket Veto Case*, 279 U.S. 655, 689 (1929) ("established practice is a consideration of great weight" for such constitutional provisions).  When construing the Constitution's broadly phrased divisions among the branches, judges "must hesitate to upset the compromises and working arrangements that the elected branches of Government themselves have reached."  *Noel Canning*, 573 U.S. at 526.

Established practice is crucial "even when the nature or longevity of that practice is subject to dispute, and even when that practice began after the founding era."  *Id.* at 525; *see also id.* at 528-29 (relying on history of intra-session recess appointments that began after the Civil War); *United States v. Midwest Oil Co.*, 236 U.S. 459, 473 (1915) ("in determining . . . the existence of a power, weight shall be given to the usage itself, even when the validity of the practice is the subject of

investigation").  As James Madison wrote, it "was foreseen at the birth of the

Constitution, that difficulties and differences of opinion . . . in expounding terms &

phrases necessarily used in such a charter . . . might require a regular course of

practice to liquidate & settle the meaning of some of them."  *Noel Canning*, 573

U.S. at 525 (quoting Letter from James Madison to Spencer Roane (Sept. 2,

1819)).

      Precedent has "continually confirmed Madison's view."  *Id.*; *e.g.*,

*McPherson v. Blacker*, 146 U.S. 1, 27 (1892) ("where there is ambiguity or doubt"

in constitutional interpretation, "subsequent practical construction is entitled to the

greatest weight"); *McCulloch v. Maryland*, 17 U.S. 316, 401 (1819) ("a doubtful

question" concerning separation of powers, "if not put at rest by the practice of the

government, ought to receive a considerable impression from that practice");

*Stuart v. Laird*, 5 U.S. 299, 309 (1803) ("practice and acquiescence" can "fix[] the

construction" of constitutional provisions, "afford[ing] an irresistible answer" to

contrary interpretations).

      Congress has been assigning regulatory authority to independent,

multimember agencies for most of the nation's history, beginning nearly 150 years

ago with the Interstate Commerce Commission.  *See* Act to Regulate Commerce,

§ 11, 24 Stat. at 383.  The ICC had investigative and enforcement authority over

the monumentally important railroad industry, including the power to issue cease-

and-desist orders, to require payment of reparations, and to enforce its orders in court.  *See id.* §§ 12-16, 20; *cf.* S-ROA.326 (emphasizing the NLRB's "executive prosecutorial power").  Although the Interior Secretary initially had some authority over the ICC, *see* Act to Regulate Commerce, §§ 18, 21, 24 Stat. at 386-87, Congress eliminated it two years later, *see* Act of Mar. 2, 1889, ch. 382, §§ 7-8, 25 Stat. 855, 861-62; Marshall J. Breger & Gary J. Edles, *Established by Practice: The Theory and Operation of Independent Federal Agencies*, 52 Admin. L. Rev. 1111, 1130 (2000).

In the early twentieth century, "a multitude of new agencies were established using the ICC as their prototype," including "the Federal Reserve Board (1913), Federal Trade Commission (1914), Federal Radio Commission (1927), Federal Power Commission (1930), Securities and Exchange Commission (1934), Federal Communications Commission (1934), National Labor Relations Board (1935), Bituminous Coal Commission (1935), and Federal Maritime Commission (1936)." Breger & Edles, *supra*, at 1116 & n.14.  The "critical element of independence" for these agencies is "protection . . . against removal except 'for cause.'"  *Id.* at 1138.

This long pedigree of multimember independent agencies is all but dispositive of their legitimacy.  "A legislative practice . . . marked by the movement of a steady stream for a century and a half of time" indicates "the

presence of unassailable ground for the constitutionality of the practice." *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 327-28 (1936).

For generations, these agencies have wielded substantial executive power. Although the Supreme Court initially conceived of their powers as "quasi-legislative or quasi-judicial," rather than as executive, *Seila Law*, 591 U.S. at 216 & n.2 (quotation marks omitted), it now recognizes that the functions which independent agencies have long carried out are "exercises of . . . the 'executive Power'" under the Constitution, *Arlington*, 569 U.S. at 304 n.4. Thus, beginning with *Humphrey's Executor*, the Court has consistently approved of removal protections for multimember agencies with powers that "at the present time" are "considered executive." *Morrison*, 487 U.S. at 699 n.28 (quotation marks omitted).

Since then, the Court has only reaffirmed that holding. In *Wiener v. United States*, it confronted "a variant of the constitutional issue decided in *Humphrey's Executor*" and reached the same result. 357 U.S. 349, 351 (1958). By the time of *Morrison*, it had been established for half a century that "the Constitution did not give the President 'illimitable power of removal' over the officers of independent agencies." 487 U.S. at 687 (quoting *Humphrey's Ex'r*, 295 U.S. at 630).

Two decades later, the Court again confirmed the validity of removal protections for multimember bodies wielding significant executive power.

24

Article II was satisfied when officers within the SEC were shielded from removal by "a single level of good-cause tenure." *Free Enter. Fund*, 561 U.S. at 509. Such officers were adequately "subject . . . to Presidential oversight." *Id.*

*Seila Law* again reinforced these principles. Not only did the Court emphatically base its holding on the "new situation" of an independent officer wielding power "alone," but it explained that Congress could cure the constitutional defect while preserving removal limits by "converting the CFPB into a multimember agency." 591 U.S. at 237.

Thus, for nearly a century, an unbroken line of decisions has approved a governmental structure pioneered another half-century earlier. Over the generations, Congress has relied on this precedent to create "some two-dozen multimember independent agencies" with for-cause removal protections. *Id.* at 230. This "practical exposition" of the Constitution is, by now, "too strong and obstinate to be shaken." *Laird*, 5 U.S. at 309.

The NLRB is itself one of the canonical independent agencies upon which Congress has modeled others. The agency has existed in essentially its current form since mere months after *Humphrey's Executor* was decided nearly 90 years ago. It is not the CFPB (created in 2010; removal protection struck down in 2020 based on its novel single-director structure) or the Public Company Accounting Oversight Board (created in 2002; removal protection struck down in 2010 based

on its novel dual layers of protection). There is simply no basis for discarding

nearly a century of history and interfering with what is now firmly established as a

"traditional way[] of conducting government." *Mistretta*, 488 U.S. at 401 (quoting

*Youngstown*, 343 U.S. at 610 (Frankfurter, J., concurring)).

## CONCLUSION

For the foregoing reasons, if this Court reaches the issue, it should affirm the

constitutionality of the removal provision governing NLRB Board Members.

Respectfully submitted,

Dated: November 4, 2024

*/s/ Brianne J. Gorod*
Elizabeth B. Wydra
Brianne J. Gorod
Brian R. Frazelle
Margaret Hassel*
CONSTITUTIONAL
   ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

* Not admitted in D.C.; supervised
by principals of the firm

*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of

Court for the United States Court of Appeals for the Fifth Circuit by using the

appellate CM/ECF system on November 4, 2024.

I certify that all participants in the case are registered CM/ECF users and

that service will be accomplished by the appellate CM/ECF system.

Executed this 4th day of November, 2024.

*/s/ Brianne J. Gorod*
Brianne J. Gorod

*Counsel for Amicus Curiae*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it contains 5,757 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using 14-point Times New Roman font.

Executed this 4th day of November, 2024.

*/s/ Brianne J. Gorod*
Brianne J. Gorod

*Counsel for Amicus Curiae*