**Nos. 24-50627, 24-40533, 24-10855**

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

24-50627

Space Exploration Technologies Corporation,

*Plaintiff-Appellee*,

v.

National Labor Relations Board; Jennifer Abruzzo, in her official capacity as the General Counsel of the National Labor Relations Board; Lauren M. McFerran, in her official capacity as the Chairman of the National Labor Relations Board; Marvin E. Kaplan, Gwynne A. Wilcox, and David M. Prouty, in their official capacities as Board Members of the National Labor Relations Board; John Doe, in their official capacity as an Administrative Law Judge of the National Labor Relations Board,

*Defendants-Appellants*

consolidated with

24-40533

Energy Transfer, L.P.; La Grange Acquisition, L.P.,

*Plaintiffs-Appellees*

v.

National Labor Relations Board; Jennifer Abruzzo, in her official capacity as the General Counsel of the National Labor Relations Board; Lauren M. McFerran, in her official capacity as the Chairman of the National Labor Relations Board; Marvin E. Kaplan, Gwynne A. Wilcox, and David M. Prouty, in their official capacities as Board Members of the National Labor Relations Board; John Doe, in their official capacity as an Administrative Law Judge of the National Labor Relations Board,

*Defendants-Appellants*

consolidated with

24-10855

Aunt Bertha, doing business as Findhelp,

*Plaintiff - Appellee*

v.

National Labor Relations Board; Jennifer Abruzzo, in her official capacity as the General Counsel of the National Labor Relations Board; Lauren M. McFerran, in her official capacity as the Chairman of the National Labor Relations Board; Marvin E. Kaplan, Gwynne A. Wilcox, and David M. Prouty, in their official capacities as Board Members of the National Labor Relations Board; John Doe, in their official capacity as an Administrative Law Judge of the National Labor Relations Board,

*Defendants – Appellants*

## BRIEF OF APPELLEE AUNT BERTHA, A PUBLIC BENEFIT CORPORATION DOING BUSINESS AS FINDHELP

/s/Talley R. Parker
Talley R. Parker
Texas State Bar No. 24065872
talley.parker@jacksonlewis.com
JACKSON LEWIS P.C.
500 N. Akard Street, Suite 2500
Dallas, Texas 75201
(214) 520-2400 – Telephone
(214) 520-2008 - Fax

COUNSEL FOR AUNT BERTHA, A PUBLIC BENEFIT CORPORATION DOING BUSINESS AS FINDHELP

### <u>CERTIFICATE OF INTERESTED PERSONS</u>

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

1.      Aunt Bertha, a public benefit corporation and doing business as Findhelp ("Findhelp") – Plaintiff-Appellee in No. 24-10855. Findhelp has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

2.      Jackson Lewis P.C. – Attorneys for Findhelp.

3.      National Labor Relations Board, a federal administrative agency – Defendant-Appellant.

4.      Jeniffer Abruzzo, in her official capacity as General Counsel of the National Labor Relations Board – Defendant-Appellant.

5.      Lauren M. McFerran, in her official capacity as the Chairperson of the National Labor Relations Board – Defendant-Appellant.

6.      Marvin E. Kaplan, Gwynne A. Wilcox, and David M. Prouty, in their official capacities as Board Members of the National Labor Relations Board – Defendant-Appellant.

7.      John Doe, in their official capacity as an Administrative Law Judge of the National Labor Relations Board – Defendant-Appellant.

8.     Attorneys for Defendants-Appellants.

9.     American Federation of Labor and Congress of Industrial Organizations (AFL-CIO) – *Amicus Curiae*.

10.     Office and Professional Employees International Union (OPEIU) – *Amicus Curiae*.

11.     Space Exploration Technologies Corporation ("SpaceX") – Plaintiff-Appellee in No. 24-50627.

12.     Energy Transfer L.P. and its subsidiary and employing entity La Grange Acquisition, L.P. ("Energy Transfer") – Plaintiff-Appellee in No. 24-40533.

13.     Morgan Lewis & Bockius LLP – Attorneys for SpaceX.

14.     Hunton Andrews Kurth LLP – Attorneys for Energy Transfer.

/s/Talley R. Parker
Talley R. Parker

## STATEMENT REGARDING ORAL ARGUMENT

The Court has ordered expedited oral argument in these consolidated appeals. *See* ECF 41-1, Unpublished Order dated Oct. 11, 2024.

# **TABLE OF CONTENTS**

STATEMENT OF JURISDICTION............................................................1

STATEMENT OF ISSUES ..................................................................1

STATEMENT OF THE CASE................................................................1

I.   Factual Background.....................................................................1

    A.   Findhelp's Operations, Unionization, and Ongoing Bargaining. ............1

    B.   The Union's Unfair Labor Practice Charges, and the NLRB's
        Proceedings. ......................................................................2

II.  Procedural Background ................................................................5

SUMMARY OF THE ARGUMENT ......................................................6

STANDARD OF REVIEW ................................................................8

ARGUMENT ..............................................................................8

I.   The Norris-LaGuardia Act is Not Implicated in an Action to Enjoin an
    Unconstitutional Hearing and Therefore Does Not Bar Injunctive Relief in this
    Case. ..................................................................................8

    A.   Defendants' Claim that the NLGA Precludes Injunctions Against the
        Government is Contrary to the Purpose of the Act. .......................9

    B.   Defendants' Claim that the NLGA Precludes Injunctions Against the
        Government is Contrary to the Act's Express Terms............................12

    C.   Defendants' Exhaustion of "Administrative Avenues" Argument is
        Misplaced. .......................................................................16

II.  The District Court Acted Within its Discretion in Granting a Preliminary
    Injunction in Findhelp's Favor........................................................18

    A.   The Standard for Injunctive Relief. ......................................18

    B.   The District Court Permissibly Concluded that Findhelp is Likely to
        Succeed on the Merits of its Constitutional Claims. ............................19

1.      NLRB ALJs are unconstitutionally insulated from removal…………………………………………………………….20

2.      NLRB Members are unconstitutionally insulated from removal…………………………………………………………….25

a.      NLRB Members do not fall within the *Humphrey's Executor* exception because they wield substantial executive power. ………………………………………25

b.      NLRB Members do not fall within the *Humphrey's Executor* exception because they do not comprise a multimember expert agency…………………………....28

c.      *Humphrey's Executor* does not apply because it dealt with different removal protections. …………………………32

d.      *Consumers' Research v. Consumer Product Safety Commission* does not apply to the NLRB. …………….33

3.      Defendants' causation argument is meritless………………....35

4.      Severance is not an option in this case……………………….41

C.      The District Court Permissibly Determined that Findhelp Would Suffer Irreparable Harm in the Absence of Preliminary Relief.......................47

D.      The District Court Permissibly Held that the Balance of Equities and Public Interest Favor a Preliminary Injunction.....................................49

CONCLUSION ...................................................................................................54

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Aeronautical Indus. Dist. Lodge 91 v. United Techs. Corp.*,
230 F.3d 569 (2d Cir. 2000) ...............................................................14

*In Re Aiken County*,
645 F.3d 428 (D.C. Cir. 2011)............................................................51

*Alabama Ass'n of Realtors v. Dep't of Health & Human Servs.*,
594 U.S. 758 (2021)............................................................................52

*Alaska Airlines, Inc. v. Brock*,
480 U.S. 678 (1987)............................................................................42

*Almacs, Inc. v. Hackett*,
312 F.Supp. 964 (D.R.I. 1970) ...........................................................13

*Alstate Maint., LLC*,
367 NLRB No. 68 (2019) ...................................................................30

*Aunt Bertha d/b/a Findhelp v. NLRB et al.*,
No. 4:24-CV-00798 (N.D. Tex. 2024) ..................................................1

*Axon Enter., Inc. v. FTC*,
598 U.S. 175 (2023).....................................................................*passim*

*Ayotte v. Planned Parenthood of N. New England*,
546 U.S. 320 (2006).....................................................................42, 47

*Bhd. of R. Trainmen v. Toledo, P & W R.R.*,
321 U.S. 50 (1944)..............................................................................17

*Bowsher v. Synar*,
478 U.S. 714 (1986)............................................................................52

*Boys Markets, Inc. v. Retail Clerks Union*,
398 U.S. 235 (1970)............................................................................14

*Browning-Ferris Indus. of California, Inc.*,
362 NLRB 1599 (2015) ......................................................................30

*BST Holdings, L.L.C. v. OSHA*,
17 F.4th 604 (5th Cir. 2021) ..............................................................50

*Buffalo Forge Co. v. United Steelworkers of Am.*,
428 U.S. 397 (1976)............................................................................11

*Burlington N. R.R. Co. v. Bhd. of Maint. of Way Employees*,
481 U.S. 429 (1987)............................................................................10

*Burlington N. Santa Fe Ry. Co. v. Int'l Bhd. of Teamsters Local 174*,
203 F.3d 703 (9th Cir. 2000) ...........................................................9, 10

*Butz v. Economou*,
438 U.S. 478 (1978)............................................................................43

*Carter v. Herrin Motor Freight Lines, Inc.*,
131 F.2d 557 (5th Cir. 1942) .............................................................17

*Chambless Enters., LLC v. Redfield*,
508 F.Supp.3d 101 (W.D. La. 2020) ..................................................48

*City of Arlington v. FCC*,
569 U.S. 290 (2013)......................................................................24, 51

*Cochran v. Sec. & Exch. Comm'n*,
20 F.4th 194 (5th Cir. 2021), *aff'd and remanded sub nom. Axon
Enter., Inc.*, 598 U.S. 175 (2023)..................................................*passim*

*Collins v. Yellen*,
594 U.S. 220 (2021)......................................................................*passim*

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*,
51 F.4th 616 (5th Cir. 2022) .............................................................35

*Consumers' Research v. Consumer Prod. Safety Comm'n*,
91 F.4th 342 (5th Cir. 2024), cert denied, 2024 U.S. Lexis 4374
(Oct. 21, 2024) ............................................................................33, 34

*Daniels Health Scis., LLC v. Vascular Health Scis., LLC*,
710 F.3d 579 (5th Cir. 2013) .............................................................50

*Delaware State Sportsmen's Ass'n Inc. v. Delaware Dep't of Safety & Homeland Sec.*,
   108 F.4th 194 (3rd Cir. 2024) .................................................................48

*Doran v. Salem Inn, Inc.*,
   422 U.S. 922 (1975) ....................................................................42, 49

*Epilepsy Found. of NE Ohio*,
   331 NLRB 92 (2000) .......................................................................30

*Epilepsy Found. v. NLRB*,
   268 F.3d 1095 (D.C. Cir. 2001) .........................................................31

*Exela Enters. Solutions, Inc. v. NLRB*,
   32 F.4th 436 (5th Cir. 2022) ............................................................34

*Fibreboard Paper Prod. Corp. v. NLRB*,
   379 U.S. 203 (1964).........................................................................26

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
   561 U.S. 477 (2010)...................................................................*passim*

*Freytag v. CIR*,
   501 U.S. 868 (1991)........................................................................40

*FTC v. U.S. Anesthesia Partners, Inc.*,
   No. 24-20270 (5th Cir. 2024) ...........................................................37

*Humphrey's Executor v. U.S.*,
   295 U.S. 602 (1935)...................................................................*passim*

*Hy-Brand Indus. Contractors, Ltd.*,
   365 NLRB 1554 (2017) ....................................................................30

*Hy-Brand Indus. Contractors, Ltd.*,
   366 NLRB No. 26 (2018) .................................................................30

*IBM Corp.*,
   341 NLRB 1288 (2004) ....................................................................30

*Jacksonville Bulk Terminals, Inc. v. Int'l Longshoremen's Ass'n*,
   457 U.S. 702 (1982)....................................................................10, 11

*Jarkesy v. SEC*,
34 F.4th 446 (5th Cir. 2022), *aff'd* 144 S.Ct. 2117 (2024)..........................*passim*

*Lambert v. Bd. of Comm'rs*,
No. 05-5931, 2006 U.S. Dist. LEXIS 105067 (E.D. La. Mar. 22, 2006) ...............................................................................................48

*Lewis Brisbois Bisgaard & Smith, L.L.P. v. Norman*,
No. 23-20065, 2024 U.S. App. LEXIS 19018 (5th Cir. July 31, 2024) .................................................................................................8

*Lincoln Lutheran of Racine*,
362 NLRB 286 (2015) ...................................................................30

*Loper Bright Enter. v. Raimondo*,
144 S.Ct. 2244 (2024)...................................................................32

*Lucia v. SEC*,
585 U.S. 237 (2018)...............................................................40, 43

*Lutheran Heritage Village-Livonia*,
343 NLRB 646 (2004) ...................................................................31

*Materials Research Corp.*,
262 NLRB 1010 (1982) ..................................................................30

*Meyers Indus. Inc.*,
281 NLRB 882 (1986) ....................................................................30

*Miller Plastic Products, Inc.*,
372 NLRB No. 134 (2023) ..............................................................30

*Morrison v. Olson*,
487 U.S. 654 (1988)...............................................................20, 23

*Much. Bell Tel. Co.*,
369 NLRB No. 124 (2024) ..............................................................24

*Murphy v. NCAA*,
584 U.S. 453 (2018)......................................................................43

*Myers v. United States*,
272 U.S. 52 (1926)..........................................................19, 24, 33

*Nat'l Ass'n of Letter Carriers v. Sombretto*,
   449 F.2d 915 (2nd Cir. 1971) ...................................................................14, 15

*New Negro Alliance v. Sanitary Grocery Co.*,
   303 U.S. 552 (1938)...................................................................................11

*Nexstar Media, Inc. Grp. v. NLRB*,
   No. 4:24-cv-01415, 2024 U.S. Dist. Lexis 163915 (N.D. Ohio
   Aug. 26, 2024) ..........................................................................................11

*NLRB v. Curtis Matheson Sci., Inc.*,
   494 U.S. 775 (1990)...................................................................................26

*NLRB v. Jones & Laughlin Steel Corp.*,
   301 U.S. 1 (1937)......................................................................................28

*NLRB v. State of Illinois Dep't of Emp't Sec.*,
   988 F.2d 735 (7th Cir. 1983) ....................................................................27

*NLRB v. State of North Dakota*,
   504 F. Supp. 2d 750 (D.N.D. 2007)...........................................................27

*Overstreet v. El Paso Disposal, L.P.*,
   625 F.3d 844 (5th Cir. 2010) ....................................................................26

*Parks v. Int'l Broth. of Elec. Workers*,
   314 F.2d 886 (4th Cir. 1963), *cert. denied*, 371 U.S. 976 (1963) .....................15

*Ramspeck v. Fed. Trial Examiners Conf.*,
   345 U.S. 128 (1953)...................................................................................43

*Retail Clerks Union v. Alfred M. Lewis, Inc.*,
   327 F.2d 442 (9th Cir. 1964) ...................................................................14, 15

*San Diego Bldg. Trades Council, Millmen's Union Local 2020 v.
   Garmon*,
   359 U.S. 236 (1959)...................................................................................27

*Scott v. Moore*,
   640 F.2d 708 (5th Cir. 1981) ....................................................................14

*Sears, Roebuck & Co.*,
   274 NLRB 230 (1985) ...............................................................................30

*SEC v. Jarkesy*,
144 S.Ct. 2117 (2024) ................................................................18, 45

*Seila Law LLC v. CFPB*,
591 U.S. 197 (2020) ......................................................................*passim*

*Sheffield v. Bush*,
604 F. Supp. 3d 586 (S.D. Tex. 2022) .............................................48

*Space Expl. Techs. Corp. v. NLRB*,
Civil No. W-24-CV-00203-ADA, 2024 U.S. Dist. Lexis 129439
(W.D. Tex. July 23, 2024) ...........................................................45, 46

*Starbucks Coffee Co.*,
372 NLRB No. 50, slip op. (2023) ....................................................27

*Stericycle, Inc.*,
372 NLRB No. 113 (2023) ................................................................31

*Tex. v. Biden*,
10 F.4th 538 (5th Cir. 2021) .............................................................50

*The Boeing Co.*,
365 NLRB 1494 (2017) .....................................................................31

*TLI, Inc.*,
271 NLRB 798 (1984) .......................................................................30

*United States v. Abbott*,
110 F.4th 700 (5th Cir. 2024) ...........................................................18

*United States v. Dabeit*,
231 F.3d 979 (5th Cir. 2000) ............................................................33

*United States v. Nat'l Treasury Employees Union*,
513 U.S. 454 (1995) .....................................................................45, 47

*United States v. Perkins*,
116 U.S. 483 (1886) ..........................................................................20

*United States v. United Mine Workers*,
330 U.S. 258 (1947) ..........................................................................13

*United Steelworkers v. Bishop*,
  598 F.2d 408 (5th Cir. 1979) ................................................................11

*Valley Hosp. Med. Ctr., Inc. v. NLRB*,
  100 F.4th 994 (9th Cir. 2024) ..............................................................31

*Valley Hosp. Medical Ctr.*,
  371 NLRB No. 160 (2022) ...................................................................30

*Valley Hosp. Medical Ctr., Inc.*,
  368 NLRB No. 139 (2019) ...................................................................30

*Valmont Indus. v. NLRB*,
  244 F.3d 454 (5th Cir. 2001) ...............................................................24

*VHS Acquisition Subsidiary No. 7 v. NLRB*,
  2024 U.S. Dist. Lexis 210129 (D.D.C. Nov. 17, 2024) ......................16

*Wenner v. Tex. Lottery Comm'n*,
  123 F.3d 321 (5th Cir. 1997) ...............................................................49

*Westrock Servs.*,
  366 NLRB No. 157, slip op. (2018) ...............................................22, 23

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)..................................................................................18

*Wooten v. Ohler*,
  303 F.2d 759 (5th Cir. 1962) ...............................................................13

**Statutes**

5 U.S.C. § 632 .............................................................................................44

5 U.S.C. § 1202 ...........................................................................................44

5 U.S.C. § 7521 .............................................................................21, 44, 45

15 U.S.C. § 2051 .........................................................................................35

15 U.S.C. § 2054 .........................................................................................35

28 U.S.C. § 1292 ...........................................................................................1

28 U.S.C. § 1331 ....................................................................................1

29 U.S.C. § 101 .....................................................................................8

29 U.S.C. § 104 ...................................................................................14

29 U.S.C. § 108 ...................................................................................16

29 U.S.C. § 113 ...................................................................................12

29 U.S.C. § 153 .............................................................................21, 33

29 U.S.C. § 154 ...................................................................................29

29 U.S.C. § 155 .............................................................................26, 34

29 U.S.C. § 156 ...................................................................................26

29 U.S.C. § 159 ...................................................................................26

29 U.S.C. § 160 ...................................................................................33

Administrative Procedure Act, Pub. L. No. 79-404, sec. 11, 60 Stat.
    237 (1946)......................................................................................44

Civil Service Reform Act of 1978, Pub. L. No. 95-454, sec. 1202(d),
    92 Stat. 1111 (1978).................................................................44, 45

**Other Authorities**

29 C.F.R. § 102 .............................................................................22, 24

72d Cong. Rec. 1st Sess. 10 (Feb. 4, 1932) ........................................9

72d Cong. Rec. 1st Sess. 23 (Feb. 4, 1932) ......................................13

Daniel Belke, *Blitzing Brady: Should Section 4(a) of the Norris-
    LaGuardia Act Shield Management from Injunctions in Labor
    Disputes?*, 113 COLUM. L. REV. 53, 54 (2013)................................10

Zev Eigen and Sandro Garofalo, *Less is More: A Case for Structural
    Reform of the National Labor Relations Board*, 98 MINN. L. REV.
    1879 (2014)....................................................................................31

Federal Trade Commission, *Annual Reports to Congress Pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976* (last visited Nov. 29, 2024), https://www.ftc.gov/policy/reports/annual-competition-reports ............................................................................34

Hearings on H.R. 11280 Before the H. Comm. on Post Off. & Civ. Serv., 95th Cong. 824 (1978)................................................................44

Hiba Hafiz, *Economic Analysis of Labor Regulation*, 2017 WIS. L. REV. 1115, 1120-22 (2017)........................................................28, 29

Michael Heilman, *The National Labor Relations Act at Fifty: Roots Revisited, Heart Rediscovered*, 23 DUQ. L. REV. 1059 (1985).........................46

National Labor Relations Board, *About NLRB: The Board*, https://www.nlrb.gov/about-nlrb/who-we-are/the-board (last visited Nov. 29, 2024)........................................................................29

National Labor Relations Board, *Litigation Regarding State Amendments*, https://www.nlrb.gov/news-outreach/fact-sheets/fact-sheet-archives/litigation-regarding-state-amendments (updated Oct. 13, 2011) .......................................................................27

Josh Kerian, *Injunctions in Labor Disputes: The History of the Norris-LaGuardia Act*, 37 N.D. L. REV. 49 (1961).........................................9

U.S. CONST. AMEND. VII ...................................................6, 18

U.S. CONST. ART. II........................................................19

Wendy Wagner, *A Place for Agency Expertise: Reconciling Agency Expertise with Presidential Power*, 115 COLUM. L. REV. 2019 (2015) .................................................................28

## STATEMENT OF JURISDICTION

The district court below (specifically, the Northern District of Texas, with respect to the NLRB's appeal as it concerns Findhelp) has subject matter jurisdiction over the claims upon which it granted preliminary injunctive relief under 28 U.S.C. § 1331.  This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF ISSUES

1.     Whether the Norris-LaGuardia Act bars a district court from enjoining unconstitutional proceedings by a U.S. governmental agency.

2.     Whether the district court abused its discretion in enjoining the NLRB's proceedings against Findhelp based on the court's finding that Findhelp is likely to succeed on its claim that the NLRB's adjudicative process is unconstitutional.

## STATEMENT OF THE CASE

I.     **Factual Background.**

A.     **Findhelp's Operations, Unionization, and Ongoing Bargaining.**

Findhelp is a public benefit corporation that provides the largest network of free and reduced-cost social services in the United States.  (ROA.12-10855.58.)[1] The company creates and maintains software that enables community organizations, governments, and businesses that hire large groups of social workers to easily

---

[1] "ROA.12-10855" refers to the Electronic Record on Appeal prepared by the district court in *Aunt Bertha d/b/a Findhelp v. NLRB et al.*, No. 4:24-CV-00798 (N.D. Tex. 2024).

manage and coordinate care for the neediest populations in the United States. (ROA.12-10855.58.)

In April 2023, Findhelp's employees voted to be represented by the Office & Professional Employees International Union (the "Union"). (ROA.12-10855.58.) Respecting the choice made by its employees, Findhelp did not challenge the results of the vote, and the Union was certified that month. (ROA.12-10855.58.) In June 2023, Findhelp and the Union began bargaining over returning remote employees to the office in cities where Findhelp has offices. (ROA.12-10855.58.) They then moved on to bargaining for a first contract and, based upon their agreement, Findhelp and the Union have been meeting several days each month in order to continue bargaining. (ROA.12-10855.59.)

At the first contract bargaining session, Findhelp presented a complete response to the Union's initial proposals, as well as additional proposals. (ROA.12-10855.59.) Since that time, the parties have exchanged numerous proposals, have reached tentative agreements on thirteen of them, and are close to agreements on others. (ROA.12-10855-59.)

**B.    The Union's Unfair Labor Practice Charges, and the NLRB's Proceedings.**

Beginning in January 2023, the Union began filing a series of charges and amended charges against Findhelp with the NLRB. (ROA.12-10855.59.) In total, the Union has filed charges in eleven separate cases, alleging dozens of separate

violations. (ROA.12-10855.59.) These allegations run the gamut of potential NLRA claims, including: making employees believe that Findhelp was watching their protected activities; removing a posting about the union election from a company chat channel; removing employee comments from a company chat channel; maintaining software on work devices that allowed the company to monitor employees' activities; changing health insurance providers from Aetna to Cigna; using a vendor other than Grubhub to provide employees' free meals without adequately bargaining with the Union; and discharging and/or disciplining employees. (ROA.12-10855.59.)

In response to requests from the NLRB, Findhelp submitted position statements and supporting evidence refuting the allegations of eight of the Union's charges in March 2023, May 2023, and March 2024. (ROA.12-10855.60.) On April 12, 2024, the NLRB's Regional Director of Region 16 issued a consolidated complaint and notice of hearing based on the charges in case numbers 16-CA-311267, 16-CA-312143, and 16-CA-313516, which were filed between January and March 2023 (the "Complaint"). (ROA.12-10855.60.)

The NLRB has not taken any action with respect to the charges in the five other cases for which Findhelp has submitted evidence, which were filed between May and October 2023, nor has it indicated when it may make a determination on

those matters.[2]  (ROA.12-10855.61.)  Although some of the charges are more than a year old, the NLRB has informed Findhelp that they remain pending and may or may not be consolidated with the Complaint, opening the door to piecemeal litigation.  (ROA.12-10855.61.)  Moreover, the NLRB has yet to seek Findhelp's position in two remaining charges that were filed in January 2024.  (ROA.12-10855.61.)

The pending Complaint and ongoing investigations were—until the district court enjoined them—adversely affecting Findhelp's ability to focus on its important public work.  (ROA.12-10855.61-62.)  Above and beyond the significant litigation costs and attorneys' fees the company has incurred, and will continue to incur, to prepare for the administrative hearing and to respond to the administrative charges, the NLRB's proceedings have sapped the company's ability to further its mission because key personnel were preoccupied preparing for an unconstitutional proceeding and responding to additional charges.  (ROA.12-10855.61.)  Until the district court's injunction was entered, there was no end in sight; the NLRB chose to pursue its litigation in a piecemeal manner and, contrary to its own policies, refused to proffer a settlement that includes the amount of damages sought.

---

[2] After the district court entered its injunction, the NLRB informed Findhelp that it had found merit in two additional charges, case nos. 16-CA-319893 (filed June 9, 2023) and 16-CA-329129 (filed October 31, 2023).  The NLRB has not taken any additional action in furtherance of its merit determination in those charges.

(ROA.12-10855.60.)  Finally, the NLRB's proceedings have harmed Findhelp's reputation as a public benefit corporation, which impacts the company's ability to attract and retain talent.  (ROA.12-10855.62.)

## II.    **Procedural Background.**

Findhelp filed its Complaint for Declaratory and Injunctive Relief (ROA.12-10855.9-26) and Emergency Motion for Preliminary Injunction (ROA.12-10855.32-52) in the Northern District of Texas – Fort Worth Division on August 20, 2024.  At the time, the NLRB's unconstitutional administrative hearing on its Complaint against Findhelp was set to begin a little over a month later: on September 23, 2024.  (ROA.12-10855.33; ROA.12-10855.72.)

Agreeing with Findhelp's position that it had satisfied the elements for preliminary injunctive relief—specifically, with respect to Findhelp's argument that the NLRB's Administrative Law Judges ("ALJ") are unconstitutionally insulated from removal—the district court granted Findhelp's motion and preliminarily enjoined the NLRB's administrative proceedings against Findhelp.  (ROA.12-10855.466.)  The district court did so through a Memorandum Opinion and Order dated September 16, 2024 (ROA.12-10855.460-466), which is the subject of Defendants-Appellants' appeal before this Court.    (ROA.12-10855.467-468.)  Because the district court found "that Findhelp is entitled to the requested relief based on the ALJ-removal argument alone, the [court] [did] not address Findhelp's

other arguments" that NLRB members were unconstitutionally shielded from removal and that the proceedings violated Findhelp's Seventh Amendment right to a jury trial. (ROA 12-10855.461.)

## SUMMARY OF THE ARGUMENT

This case is about denying a politically unaccountable government agency and its officers *carte blanche* to execute their everchanging policies, with no Presidential oversight, in violation of the Constitution.

The NLRB has accused Findhelp of violating federal labor law and seeks to recover far-ranging and unlimited pecuniary and compensatory damages on behalf of certain former Findhelp employees. The NLRB seeks to do this in an administrative hearing before an NLRB ALJ. But the structure of this proceeding violates the United States Constitution because both the ALJ and the NLRB's Board Members exercise substantial executive authority while being insulated from Presidential control, in violation of Article II of the U.S. Constitution. The district court acted within its discretion by finding that Findhelp was entitled to preliminary injunctive relief on the ALJ-removal issue under controlling Supreme Court and Fifth Circuit precedent.

As an initial matter, the Norris-LaGuardia Act does not bar the district court's grant of an injunction in this matter. Defendants' suggestion that the statute bars federal courts from enjoining federal agencies from violating the Constitution is

contrary to both the Act's purpose—to protect the ability of "persons" to engage in strike, picket, boycott, or similar activity—and express text.

As to the merits, binding Supreme Court and Fifth Circuit precedent compels the conclusion that Findhelp will ultimately succeed on the merits of its claims, and this Court should therefore uphold the district court's grant of a preliminary injunction enjoining the NLRB's proceedings. Contrary to Defendants' arguments, the limited exceptions to Article II's ban on removal restrictions do not apply to NLRB ALJs or members. Further, Defendants' attempt to circumvent this Constitutional shortcoming by imposing a heightened causation requirement or intimating that severance may be appropriate is contrary to established law.

As to the remaining injunction factors, the Supreme Court has held that "being subjected to unconstitutional agency authority . . . by an unaccountable ALJ . . . is a here-and-now injury" that is "impossible to remedy once the proceeding is over." *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 191 (2023). If the "illegitimate proceeding before an illegitimate decisionmaker" were allowed to proceed, "structural constitutional claims would come too late to be meaningful" because a "proceeding that has already happened cannot be undone" and results in an "injury. . . impossible to remedy." *Id.* Finally, there can be no public interest in favor of allowing unconstitutional government action, particularly when such action threatens to sever

the chain of accountability established by the Constitution's separation of powers provisions.

For these reasons, and as further addressed herein, this Court should affirm the district court's grant of a preliminary injunction enjoining the NLRB's administrative proceedings against Findhelp.

## STANDARD OF REVIEW

The Court will "review a district court's grant of a preliminary injunction for an abuse of discretion." *Lewis Brisbois Bisgaard & Smith, L.L.P. v. Norman*, No. 23-20065, 2024 U.S. App. LEXIS 19018, at *4 (5th Cir. July 31, 2024). Factual findings are reviewed for clear error while legal conclusions are reviewed de novo. *Id.* (citing *Moore v. Brown*, 868 F.3d 398, 403 (5th Cir. 2017) (per curiam)).

## ARGUMENT

I. **The Norris-LaGuardia Act is Not Implicated in an Action to Enjoin an Unconstitutional Hearing and Therefore Does Not Bar Injunctive Relief in this Case.**

For the first time in this litigation, the NLRB Defendants argue in their brief that the anti-injunction provisions of the Norris-LaGuardia Act ("NLGA"), 29 U.S.C. § 101, apply to this case. Specifically, Defendants contend that, under the NLGA, which bars injunctions in certain suits relating to labor disputes, federal courts are powerless to enjoin them from engaging in even the most blatant unlawful behavior with respect to any possible action they may take because—quite

literally—*everything they do* has a nexus to a "labor dispute."  (NLRB Brief at 18.)

This argument not only places Defendants above the law, but it ignores the NLGA's

underlying purpose and plain text.

### A.    Defendants' Claim that the NLGA Precludes Injunctions Against the Government is Contrary to the Purpose of the Act.

Defendants' arguments in support of their attempt to use the NLGA to shield

their unconstitutional proceedings disregard the statute's purpose.  Congress passed

the NLGA because, in the early 1900s, employers commonly used the temporary

restraining order as their primary tool to break strikes and compel workers to return

to work.  Josh Kerian, *Injunctions in Labor Disputes: The History of the Norris-

LaGuardia Act*, 37 N.D. L. REV. 49, 51-52 (1961).  These orders were typically

issued ex parte and "were comprehensive documents enjoining workers from doing

legal as well as illegal acts." *Id.*  They "enabled employers to defeat unions instantly

by preventing them from using self-help and destroying the momentum of strikes

before substantive legal rights were litigated." *Burlington N. Santa Fe Ry. Co. v.

Int'l Bhd. of Teamsters Local 174*, 203 F.3d 703, 707 (9th Cir. 2000).

In passing this legislation, Congress made it clear that its "primary object . . .

is to protect labor in the lawful and effective exercise of its conceded rights -- to

protect, first, the right of free association and, second, the right to advance the lawful

object of association."  72d Cong. Rec. 1st Sess. 10 (Feb. 4, 1932).  In the ensuing

years, courts and commentators have acknowledged this underlying purpose to

protect the ability of employees and those affiliated with them to engage in picketing and strike activity.  *See Burlington N. Santa Fe Ry. Co.*, 203 F.3d at 707 (NLGA intended to address the "extraordinary problem" of "federal courts routinely enjoin[ing] labor picketing at the behest of employers") (citations and quotation marks omitted); Daniel Belke, *Blitzing Brady: Should Section 4(a) of the Norris-LaGuardia Act Shield Management from Injunctions in Labor Disputes?*, 113 COLUM. L. REV. 53, 54 (2013) (noting NLGA intended "to remedy a long history of employee abuse in federal court, specifically the judiciary's liberal grants of injunctive relief in favor of management in labor disputes to halt worker strikes").

Taking note of this intent, the Supreme Court has explained that the Act "expresses a basic policy against the injunction of activities of *labor unions.*" *Burlington N. R.R. Co. v. Bhd. of Maint. of Way Employees*, 481 U.S. 429, 437 (1987) (emphasis added) (quoting *Int'l Ass'n of Machinists v. Street*, 367 U.S. 740, 772 (1961)); *see also Jacksonville Bulk Terminals, Inc. v. Int'l Longshoremen's Ass'n*, 457 U.S. 702, 715 (1982) (explaining that the NLGA was "enacted in response to federal court intervention on behalf of employers through the use of injunctive powers against unions and other associations of employees").

The injunction in this case has nothing to do with the "activities of labor unions."  Contrary to Defendants' audacious claim that "the employers' quarrel in the actions below is nominally with the government and its procedures" (NLRB

Brief at 20), there is nothing "nominal" about the dispute between Findhelp and the government. That dispute is the sole issue presented to this Court. Findhelp did not seek to enjoin a labor organization or any other "person"; it sought an injunction only against the Defendant-government-officials. Findhelp did not seek to prevent protected activities such as a strike, picket, or boycott; it sought an injunction only to prevent Defendants from compelling it to participate in an unconstitutionally structured agency proceeding. Defendants have cited no compelling authority suggesting Congress intended for the anti-injunction provisions of the NLGA to cover such a claim, and there is none.[3]

---

[3] All of the cases Defendants cite in support of their argument that the present case "involves" and "grows out of" a labor dispute involve situations in which employers sought to enjoin labor unions or other persons from engaging in protected activity. None of the cases sought to enjoin government action. *See, e.g.*, *Jacksonville Bulk Terminals, Inc.*, 457 U.S. at 706-07 (injunction to prevent union from engaging in a politically motivated work stoppage); *New Negro Alliance v. Sanitary Grocery Co.*, 303 U.S. 552, 559 (1938) (injunction to enjoin picketing in protest of the employer's employment policy against hiring African Americans); *Buffalo Forge Co. v. United Steelworkers of Am.*, 428 U.S. 397, 405 (1976) (injunction to prevent sympathy strike); *United Steelworkers v. Bishop*, 598 F.2d 408, 415 (5th Cir. 1979) (injunction preventing picketing). The NLRB also cites *Nexstar Media, Inc. Grp. v. NLRB*, No. 4:24-cv-01415, 2024 U.S. Dist. Lexis 163915 (N.D. Ohio Aug. 26, 2024), but that out-of-circuit case fails to provide any analysis as to why the NLGA would apply to the present claims.

**B.  Defendants' Claim that the NLGA Precludes Injunctions Against the Government is Contrary to the Act's Express Terms.**

Defendants' overreach is also clear from the NLGA's text.  Their suggestion that Section 13(c)'s definition of what constitutes a "labor dispute" applies to this case ignores Sections 13(a) and 13(b), which expressly limit the NLGA's reach. Section 13(a) provides that a "case shall be held to involve or grow out of a labor dispute" only when it:

> involves persons who are engaged in the same industry, trade, craft, or occupation; or have direct or indirect interests therein; or who are employees of the same employer; or who are members of the same or an affiliated organization of employers or employees . . . .

29 U.S.C. § 113(a).  Similarly, Section 13(b) states that a "person or association shall be held to be a person participating in or interested in a labor dispute" only if that person or organization:

> is engaged in the same industry, trade, craft, or occupation in which such dispute occurs, or has a direct or indirect interest therein, or is a member, officer, or agent of any association composed in whole or in part of employers or employees engaged in such industry, trade, craft, or occupation.

29 U.S.C. § 113(b).

Defendants do not fit within any of these definitions.  Neither the ALJ nor the NLRB members are "engaged in the same industry, trade, craft, or occupation" as Findhelp's employees.  As civil servants of a neutral federal agency, they do not "have direct or indirect interests" in a private sector labor dispute.  And neither the

ALJ nor the NLRB members are "employees of the same employer," "members of the same or an affiliated organization of employers or employees," or "a member, officer, or agent of any association composed in whole or in part of employers or employees engaged in such industry, trade, craft, or occupation." *See* 72d Cong. Rec. 1st Sess. 23 (Feb. 4, 1932) ("The main purpose of these definitions" is to ensure that the NLGA is applied to "the special type of cases" where employers seek injunctive relief "to coerce employees into accepting terms and conditions of employment desired by employers").

Nor does this case involve an injunction against a "person" within the meaning of Sections 13(a) and 13(b). The NLGA's prohibition "extends only to 'persons' as defined in the Act" and it is "well established" that neither the United States nor a state agency can "be a person within the meaning of the Act." *Almacs, Inc. v. Hackett*, 312 F.Supp. 964, 967 (D.R.I. 1970). *See also United States v. United Mine Workers*, 330 U.S. 258, 275 (1947) (explaining that the federal government is not a "person" under the NLGA and therefore the district court had jurisdiction to issue injunctive relief); *Wooten v. Ohler*, 303 F.2d 759, 762-63 (5th Cir. 1962) (NLGA did not deprive court of jurisdiction to enjoin sheriff from preventing plaintiff from

picketing because the NLGA's definition of a person "would hardly include peace officers").[4]

Further, the NLGA's inapplicability is underscored by Section 4 of the Act. Consistent with the NLGA's intent to protect the right of unions and other persons to strike, that section spells out nine specific categories of employee conduct during labor disputes that courts may *not* enjoin. 29 U.S.C. § 104. If none of those categories of employee conduct are implicated, the anti-injunction provisions of the NLGA do not apply: "the Act does not impose an unqualified prohibition against federal injunctive relief. Section 105 merely restricts the court's power to enjoin concerted or conspiratorial activity where the conduct to be enjoined is an act enumerated in section 104." *Scott v. Moore*, 640 F.2d 708, 714 (5th Cir. 1981). *See also Aeronautical Indus. Dist. Lodge 91 v. United Techs. Corp.*, 230 F.3d 569, 580 (2d Cir. 2000) (explaining that federal courts may "issue an injunction in a labor dispute against conduct not specifically enumerated in [Section 4] or otherwise related to the abuses that motivated the [NLGA]"); *Nat'l Ass'n of Letter Carriers v.*

---

[4] The NLGA was enacted three years before the NLRA. If Congress intended the NLGA to prohibit injunctive relief against the NLRB, it would have amended the NLGA or addressed the issue when it enacted the NLRA. *See Boys Markets, Inc. v. Retail Clerks Union*, 398 U.S. 235, 258-59 (1970) (Black, J., dissenting) (explaining that Congress debated subsuming the NLGA into the NLRA but ultimately decided against doing so). In the near century since its passage, the NLGA has not been amended to preclude injunctive relief against the NLRB.

*Sombretto*, 449 F.2d 915, 919 (2nd Cir. 1971) ("Section 4 restricts the federal court's jurisdiction only in certain specified instances, particularly with regard to the enjoining of strikes . . . ."); *Retail Clerks Union v. Alfred M. Lewis, Inc.*, 327 F.2d 442, 448 (9th Cir. 1964) (case did not involve "the type of labor dispute to which Norris LaGuardia is directed" because no specific provision of § 4 was applicable); *Parks v. Int'l Bhd. of Elec. Workers*, 314 F.2d 886, 919 (4th Cir. 1963) ("[I]injunctive relief sought by [the union] -- restoration of its charter, etc. -- may also be said not to be 'a part and parcel of the abuses against which the Act,' as indicated by the specific matters listed in section 4, was directed"), *cert. denied*, 371 U.S. 976 (1963).

Finally, an examination of the requirements imposed by the NLGA's anti-injunction provision further makes it clear that it is not intended to apply to the present case. Under Section 7(e), a federal court may not issue an injunction unless it finds "[t]hat the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection." Such an inquiry would make no sense here. It is unclear who the relevant "public officers" would be or how Findhelp could make a showing that they are "unable or unwilling" to protect its interests. That provision plainly contemplates the kind of strike-related labor disputes that the Act was designed to protect. This incompatibility between the

inquiry required under the NLGA and the facts of this case further demonstrate that the statute is inapplicable.[5]

### C. Defendants' Exhaustion of "Administrative Avenues" Argument is Misplaced.

Defendants argue that, even if the NLGA permitted injunctive relief, the district court erred by granting such relief here because Findhelp failed to comply with Section 8 of the NLGA, 29 U.S.C. § 108, by failing to exhaust an "administrative avenue"—i.e., Defendants' unfair labor practice proceedings—and by failing to make "every reasonable effort" to "resolve their differences with their employees."   (NLRB Brief at 24.)   That argument fails for the same reason the NLRB's anti-injunction argument fails: this case is a dispute between Findhelp and the government concerning the constitutionality of agency proceedings.   Thus, there are no "differences with []employees to resolve" in this case, as the employees have no ability to address the constitutional flaws inherent in Defendants' processes.

---

[5] Defendants may rely on *VHS Acquisition Subsidiary No. 7 v. NLRB*, 2024 U.S. Dist. Lexis 210129 (D.D.C. Nov. 17, 2024), which held that the NLGA precluded an injunction against the NLRB.   That case is not persuasive.   The court failed to consider the Act's legislative history and traditional applications; and in concluding that the matter before it involved or grew out of a labor dispute under Section 13(a), the court omitted the operative, limiting language of Section 13(a) (i.e., "persons who are engaged in the same industry, trade, craft, or occupation," etc.) with ellipses. *Id.* at *12-13.   Further,  the court failed to consider whether a governmental agency such as the NLRB is a "person" covered by the statute and ignored Sections 13(b), 4, and 7 in its analysis.

Additionally, Defendants' reliance on Section 8 is misplaced because the section applies to dispute resolution procedures such as arbitration and mediation, which may result in the parties reaching a voluntary resolution of the labor dispute. As Section 8 recognizes, these procedures may be statutorily mandated, *see, e.g.*, *Bhd. of R. Trainmen v. Toledo, P & W R.R.*, 321 U.S. 50, 56-57 (1944) (failure to invoke mandatory arbitration procedures under the Railway Labor Act), or voluntary, *see, e.g.*, *Carter v. Herrin Motor Freight Lines, Inc.*, 131 F.2d 557, 561 (5th Cir. 1942) (denying injunction to plaintiff who while "standing on his legal rights," failed to "use every reasonable effort by negotiation, mediation, or arbitration"). Simply stated, an adversarial unfair labor practice trial prosecuted by the government, in which the government seeks significant compensatory damages, is not a dispute resolution procedure contemplated by Section 8.[6]

In sum, Defendants' arguments regarding NLGA are easily dismissed. This case involves an action to enjoin a government agency from engaging in an

---

[6] But even if Section 8 were to apply to an action against the NLRB, before issuing the unfair labor practice complaint against Findhelp that underlies this case, the NLRB's own policies and procedures required it to pursue resolution through settlement. *See* National Labor Relations Board Casehandling Manual Part One, §§ 10126-10130. Presumably Defendants complied with their own policies, which means that all reasonable efforts to resolve the underlying labor dispute have been exhausted.

unconstitutional proceeding; nothing more, nothing less. The NLGA does not give Defendants license to operate outside of the law.

## II. The District Court Acted Within its Discretion in Granting a Preliminary Injunction in Findhelp's Favor.

### A. The Standard for Injunctive Relief.

A court should grant preliminary injunctive relief when a plaintiff shows that (1) it is likely to succeed on the merits of the claim; (2) it is likely to suffer irreparable injury absent preliminary relief; (3) the balance of equities tips in its favor; and (4) the public interest favors an injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "The first factor – likelihood of success on the merits – is 'the most important.'" *United States v. Abbott*, 110 F.4th 700, 706 (5th Cir. 2024) (quoting *Mack v. Garland*, 75 F.4th 563, 587, n.60 (5th Cir. 2023)). The district court permissibly concluded that Findhelp meets all four of these factors with respect to its claim that NLRB ALJs are unconstitutionally insulated from removal. Further, Findhelp satisfies all four factors with respect to its claim that NLRB members are also unconstitutionally insulated from removal, which was not addressed in the decision below.[7]

---

[7] At the district court, Findhelp also argued that Defendants' proceedings against Findhelp violate Findhelp's Seventh Amendment right to a jury trial because the damages sought in the ULP hearing are legal in nature. *See SEC v. Jarkesy*, 144 S.Ct. 2117 (2024); U.S. Const. Amend. VII (stating that in "[s]uits at common law . . . the right of trial by jury shall be preserved"). The district court did not address

**B.      The District Court Permissibly Concluded that Findhelp is Likely to Succeed on the Merits of its Constitutional Claims.**

Article II of the Constitution mandates that the President must "take care that the Laws be faithfully executed."  U.S. CONST. ART. II, § 3, cl. 3 (the "Take Care Clause").  Although the President exercises his authority through "the assistance of subordinate[]" officers, *Myers v. United States*, 272 U.S. 52, 117 (1926), the Supreme Court has consistently held that Article II requires that executive authority remain vested in the President.  *Seila Law LLC v. CFPB*, 591 U.S. 197, 213 (2020).  That means that the officers of every administrative agency, including "independent" agencies such as the NLRB, must remain subject to Presidential oversight and control.  *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 499 (2010).  An essential aspect of this oversight and control, according to the Supreme Court, is the "power to remove—and thus supervise—those who wield executive power on the President's behalf."  *Seila Law*, 591 U.S. at 204.  "Without such power, the President could not be held fully accountable for discharging his own responsibilities; the buck would stop somewhere else."  *Id.*

The President's power to remove executive officials thus remains "the rule, not the exception."  *Id.* at 206.  Although the Supreme Court has recognized two "exceptions" to the removal power, they are narrowly limited.  *Id.* at 218.  First,

---

those arguments, nor did Defendants in their brief.  Therefore, Findhelp does not address that issue here, but reserves the right to urge it in future proceedings.

*Humphrey's Executor v. U.S.*, 295 U.S. 602 (1935), recognized an exception for principal officers heading "multimember expert agencies that do not wield substantial executive power." *Seila Law*, 591 U.S. at 250. Second, *Morrison v. Olson*, 487 U.S. 654 (1988), and *United States v. Perkins*, 116 U.S. 483 (1886), recognized an exception for "inferior officers with limited duties and no policymaking or administrative authority." *Seila Law*, 591 U.S. at 218. These two exceptions mark "the outermost constitutional limits of permissible congressional restrictions on the President's removal power." *Id.*; *see also id.* at 248 (Thomas, J., concurring in part and dissenting in part) ("After *[Seila Law]*, the foundation for *Humphrey's Executor* is not just shaky, it is nonexistent.").

### 1. NLRB ALJs are unconstitutionally insulated from removal.

The "most important" question for the purposes of deciding the appropriateness of preliminary injunctive relief is whether the ALJs' removal protections violate the Constitution's Take Care Clause. Yet Defendants barely address this question in their brief, which devotes all of two paragraphs to this subject. The reason is obvious: controlling Fifth Circuit precedent forecloses any argument that the NLRB ALJs' removal protections comply with constitutional mandates.

The district court recognized this when it concluded that, under *Jarkesy v. SEC*, 34 F.4th 446, 464 (5th Cir. 2022), *aff'd on other grounds* 144 S.Ct. 2117

(2024), the for-cause removal restrictions applicable to NLRB ALJs violate Article II.  In *Jarkesy*, the Fifth Circuit held that (1) SEC ALJs were inferior officers who exercised significant administrative authority and (2) these ALJs were unconstitutionally protected from removal because multiple layers of for-cause removal protections stood in the way of the President's ability to remove them. *Jarkesy*'s reasoning—equally applicable here—was simple and straightforward, hewing to *Free Enterprise Fund* and prior Supreme Court precedent:

> SEC ALJs are inferior officers; they can only be removed by the SEC Commissioners if good cause is found by the Merit Systems Protection Board; SEC Commissioners and MSPB members can only be removed by the President for cause; so, SEC ALJs are insulated from the President by at least two layers of for cause protection from removal, which is unconstitutional under *Free Enterprise Fund*.

*Jarkesy*, 34 F.4th at 464.

So too here.  NLRB ALJs are cloaked in multiple layers of tenure protection. The NLRB may remove them "only for good cause established and determined by the [MSPB] on the record after opportunity for hearing before the [MSPB]," 5 U.S.C. § 7521(a), which is reviewable by federal court.  28 U.S.C. § 1295(a)(9). NLRB members, in turn, can only be removed for "neglect of duty or malfeasance, but for no other cause."  29 U.S.C. § 153(a).  And the MSPB officers are similarly protected by for cause provisions.  5 U.S.C. § 1202(d).  Thus, if the President wanted to remove an ALJ, he would have to convince the NLRB.  The NLRB would then

have to petition a different agency, the MSPB.  Next, the MSPB would have to find

good cause and so inform the NLRB.  The NLRB would then have to act on that

finding.  Like the stacked tenure protections in *Free Enterprise Fund*, this structure

"not only protects [ALJs] from removal except for good cause but withdraws from

the Presidency any decision on whether that good cause exists.  That decision is

vested instead in other tenured officers . . . none of whom is subject to the President's

direct control."  *Free Enter. Fund.*, 561 U.S. at 495.

Defendants halfheartedly try to distinguish *Jarkesy* by arguing that the NLRB

ALJs' "powers are materially more restricted in scope than" those of their SEC

brethren.  (NLRB Brief at 39.)  In support of this argument, Defendants claim that

the NLRB's ALJs lack the power to punish contemptuous conduct and cannot issue

final and binding orders.  (NLRB Brief at 38-39.)  Neither claim is true.  NLRB ALJs

can punish contemptuous conduct by "exclud[ing] persons or counsel from [a]

hearing."  29 C.F.R. § 102.35(a)(6).  They may also issue decisions that, in the

absence of timely exceptions, pursuant to Section 10(c) of the Act, "*automatically*

*become the decision and order of the Board.*"  29 C.F.R. § 102.48(a) (emphasis

added).

Defendants' position that their ALJs are materially different than SEC ALJs

is also misleading.  Binding precedent of the NLRB itself explicitly states that NLRB

ALJs are "inferior officers" just "like SEC judges."  *Westrock Servs.*, 366 NLRB

No. 157, slip op. at 1 (2018) ("Although the Court's holding in *Lucia* was specific to SEC administrative law judges, its reasoning supports a determination that Board judges, like SEC judges, are inferior officers."). Defendants' self-serving about-face on the status of its ALJs cannot allow them to wriggle out of the controlling law of this Circuit.

Finally, Defendants contend that the President's constitutional powers are not infringed upon because ALJs exercise "purely adjudicative authority." (NLRB Brief at 39.) This argument, and the out-of-circuit cases cited in support, are wrong on both the law and the facts. The Court's decision in *Seila Law* did not hinge on an analysis of the ALJs' adjudicative authority; rather, the Court made it clear that the only question is whether ALJs exercise "limited duties and no policymaking or administrative authority." *Seila Law*, 591 U.S. at 218. The answer to these questions is "no."

To begin with, NLRB ALJs' duties are far from "limited." Unlike the special counsel in *Morrison*, who was assigned a "single task" of temporary duration—investigating and prosecuting specific crimes by three high-ranking government employees—NLRB ALJs are tasked with adjudicating disputes involving private sector employers, employees, and unions nationwide. In doing so, they exercise "significant discretion" under the laws of the United States, serve indefinitely, have "nearly all the tools of federal judges," have the power to "critically shape the

administrative record," and "issue decisions containing factual findings, legal conclusions, and appropriate remedies." *Lucia*, 585 U.S. at 248-49.

Further, as their title makes clear, NLRB ALJs exercise significant administrative authority. Their performance of adjudicative functions arises in the context of administrative proceedings by an executive agency to enforce the NLRA and, therefore, represents a prototypically administrative function. *See Myers*, 272 U.S. at 135 (noting that the President's power to control encompasses the power to remove executive officers who have "duties of a quasi-judicial character," such as "members of executive tribunals whose decisions after hearing affect interests of individuals"); *City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013) (ALJ adjudications are an "exercise[] of – indeed, under our constitutional structure [it] must be [an] exercise of – the executive power"). As factfinders in administrative proceedings, ALJs wield significant administrative power because their findings often become final decisions of the NLRB. 29 C.F.R. § 102.48(a). But even when a party excepts to an ALJ decision, the ALJ's findings nonetheless constrain review by both the NLRB and courts. *See, e.g.*, *Much. Bell Tel. Co.*, 369 NLRB No. 124, n.4 (2024) (noting the "Board's established policy is not to overrule an administrative law judge's credibility resolutions unless the clear preponderance of all the relevant evidence convinces us that they are incorrect"); *Valmont Indus. v. NLRB*, 244 F.3d 454, 463 (5th Cir. 2001) ("Absent extraordinary circumstances, a

reviewing court does not substitute its view of credibility for that of the ALJ or weigh the credibility of one witness against another and search for contradictory inferences.").

In short, *Jarkesy*'s reasoning—finding that SEC ALJs' removal protections violate Article II—applies with equal force to the NLRB's ALJs. The district court correctly concluded that Findhelp is likely to succeed on the merits of its claim that Defendants' ALJs are unconstitutionally protected from removal.

### 2. NLRB Members are unconstitutionally insulated from removal.

In addition to its argument regarding ALJs, Findhelp alleged unconstitutional removal protections for NLRB members as an additional basis for preliminary injunctive relief in the proceedings below. Although the district court did not address the member argument, it has been raised and fully briefed as part of the consolidation of this case in connection with Case No. 24-50627. Because a ruling on this issue by the Court will impact Findhelp's ability to proceed with this claim, Findhelp will address the unconstitutionality of NLRB member removal protections herein.

### a. *NLRB Members do not fall within the Humphrey's Executor exception because they wield substantial executive power.*

As noted above, the Supreme Court recognized a limited exception for principal officers heading "multimember expert agencies that do not wield

25

substantial executive power." *Seila Law*, 591 U.S. at 250. In their brief, Defendants do not even pretend that current-day NLRB members fit within *Humphrey's Executor*'s description of officers who "do not exercise any executive power." *Id.* at 216. That is because they cannot.

NLRB members exercise executive power in a multitude of ways. They are charged with preventing any person from engaging in unfair labor practices, deciding unfair labor practice charges, issuing subpoenas, engaging in rulemaking, conducting union representation elections, determining appropriate units for collective-bargaining, and adjudicating representation election disputes. 29 U.S.C. §§ 156, 159, 160. NLRA Section 10(j) authorizes NLRB members to seek injunctive relief in federal court, a power which is "prosecutorial in nature." *Overstreet v. El Paso Disposal, L.P.*, 625 F.3d 844, 852 (5th Cir. 2010). Further, the NLRA broadly authorizes NLRB members to "prosecute any inquiry necessary to its functions in any part of the United States" to enforce the statute. 29 U.S.C. § 155.

NLRB members also shape national labor policy through their administrative adjudications. *NLRB v. Curtis Matheson Sci., Inc.*, 494 U.S. 775, 786 (1990) ("This Court has emphasized often that the NLRB has the primary responsibility for developing and applying national labor policy."). In that role, the Board receives significant deference from the courts. *See Fibreboard Paper Prod. Corp. v. NLRB*, 379 U.S. 203, 216 (1964) ("The Board's power is a broad discretionary one, subject

to limited judicial review."). In some instances, Board decisions displace state law, giving it a powerful role in shaping the relationship between the national government and the states. *See San Diego Bldg. Trades Council, Millmen's Union Local 2020 v. Garmon*, 359 U.S. 236, 244-45 (1959) (holding that national labor policy as developed by the Board preempted state tort law with respect to picketing); *Starbucks Coffee Co.*, 372 NLRB No. 50, slip op. at 6 (2023) (ruling that state laws prohibiting eavesdropping "must yield" to the NLRA).[8]

Plainly, then, NLRB members exercise "substantial executive power." Their powers go well beyond the limited quasi-judicial, quasi-legislative functions described by *Humphrey's Executor* and contemplated by its exception. If establishing a national labor policy and preempting state laws and constitutional provisions is not a significant executive power, it would be hard to imagine what is.

---

[8] NLRB members also shape national labor policy through more direct means. For example, on January 6, 2011, they authorized a lawsuit against the State of Arizona to enjoin it from enforcing a constitutional amendment requiring secret ballot elections to determine union representation issues. *See* National Labor Relations Board, *Litigation Regarding State Amendments*, https://www.nlrb.gov/news-outreach/fact-sheets/fact-sheet-archives/litigation-regarding-state-amendments (updated Oct. 13, 2011). *See also NLRB v. State of North Dakota*, 504 F. Supp. 2d 750 (D.N.D. 2007) (NLRB successfully argued that a state statute requiring non-union members to pay the union for the costs of processing their grievances conflicted with federal law); *NLRB v. State of Illinois Dep't of Emp't Sec.*, 988 F.2d 735 (7th Cir. 1983) (NLRB obtained injunction precluding State from implementing law which allowed it to recoup unemployment payments from backpay awards).

**b.** ***NLRB Members do not fall within the Humphrey's Executor exception because they do not comprise a multimember expert agency.***

Even if the NLRB members did not exercise significant executive power, they still fail to satisfy the second prong of the *Humphrey's Executor* exception, which requires that the principal officers comprise a "multimember *expert* agency." *Seila Law*, 591 U.S. at 250 (emphasis added).

When the Supreme Court decided *Humphrey's Executor*, "agencies in the United States were generally viewed as neutral experts who would resolve the nation's complex socio-political challenges" by proposing "empirically verifiable answers." Wendy Wagner, *A Place for Agency Expertise: Reconciling Agency Expertise with Presidential Power*, 115 COLUM. L. REV. 2019, 2024 (2015). This would describe the NLRB at its inception and when its constitutionality was addressed in *NLRB v. Jones & Laughlin Steel Corporation*, 301 U.S. 1 (1937). At that time, the Board—through its Division of Economic Research, an in-house think tank that collected and analyzed data on work stoppages—investigated the causes of such stoppages, studied possible solutions, and sought to make enforcement decisions in a diverse range of labor markets based on empirical data. *See* Hiba Hafiz, *Economic Analysis of Labor Regulation*, 2017 WIS. L. REV. 1115, 1120-22 (2017); *see also* Staff of S. Comm. on Educ. & Labor, 74th Cong., Comparison of S. 2926 (73d Cong.) and S. 1958 (74th Cong.) (Comm. Print 1935), reprinted in 1

Legis. History of the National Labor Relations Act, at 1319, 1320 (1949) (as initially conceived, NLRB was to be made up of "strictly nonpartisan" government representatives). That is no longer so. Twenty years after *Jones & Laughlin*, in 1947, Congress amended the NLRA to ban the agency from employing any person "for the purpose of . . . economic analysis." 29 U.S.C. § 154(a).

NLRB members no longer operate as experts in any technical or scientific socio-economic field; rather, they simply enforce the NLRA through an in-house adjudicatory process in which they decide unfair labor practice cases based on their prior decisions. *See* National Labor Relations Board, *About NLRB: The Board*, https://www.nlrb.gov/about-nlrb/who-we-are/the-board (last visited Nov. 29, 2024) (the NLRB "primarily acts as a quasi-judicial body in deciding cases on the basis of formal records in administrative decisions"). The NLRB members' decisions are not informed by bargaining studies, wage statistics, social-science research, or any other objective data. Hafiz, supra at 1132-35. On the contrary, NLRB decisions are based only on its members' own judgments, which themselves rely on "ideological arguments or purely abstract common-law based arguments about rights untethered to how employer or employee conduct impact those rights." *Id.*

The consequences of this shift, and the lack of any real expertise, is apparent in the NLRB members' erratic decision-making. The NLRB has flip-flopped on a number of key statutory interpretations for no reason other than a change in

administration. One example concerns the NLRB's position on whether the NLRA grants a non-union employee the right to have a co-worker representative present during an investigatory interview. The NLRB answered yes to this question in 1982, no in 1985, yes again in 2000, and no again in 2004.[9] Another example involves the NLRB's position on whether an employer can unilaterally cease union dues checkoff deductions after the expiration of a collective bargaining agreement. In 2015, the NLRB said no; four years later, it said yes; and three years after that, it again said no.[10]

Other examples of NLRB members' inconsistency abound, including: the meaning and scope of "concerted activity" under the NLRA;[11] the definition of and circumstances giving rise to a joint employment relationship;[12] and the legal

---

[9] *See Materials Research Corp.*, 262 NLRB 1010 (1982); *Sears, Roebuck & Co.*, 274 NLRB 230 (1985); *Epilepsy Found. of NE Ohio*, 331 NLRB 92 (2000); *IBM Corp.*, 341 NLRB 1288 (2004).

[10] *See Lincoln Lutheran of Racine*, 362 NLRB 286, 293 (2015); *Valley Hosp. Med. Ctr., Inc.*, 368 NLRB No. 139 (2019); *Valley Hosp. Med. Ctr.*, 371 NLRB No. 160 (2022).

[11] *See Meyers Indus. Inc.*, 281 NLRB 882 (1986); *Alstate Maint., LLC*, 367 NLRB No. 68 (2019); *Miller Plastic Prods., Inc.*, 372 NLRB No. 134 (2023).

[12] *See TLI, Inc.*, 271 NLRB 798, 798 (1984); *Browning-Ferris Indus. of California, Inc.*, 362 NLRB 1599, 1600 (2015); *Hy-Brand Indus. Contractors, Ltd.*, 365 NLRB 1554 (2017); *Hy-Brand Indus. Contractors, Ltd.*, 366 NLRB No. 26 (2018).

standards for determining the lawfulness of handbook rules.[13]  The Board's near-constant flip-flopping has become, as one court of appeals put it, a "fact of life in NLRB lore." *Epilepsy Found. v. NLRB*, 268 F.3d 1095, 1097 (D.C. Cir. 2001).  Far from a panel of experts employing empirical techniques to promote a stable and lasting national labor policy, NLRB members "veer[ ] violently left and right, a windsock in political gusts." *Valley Hosp. Med. Ctr., Inc. v. NLRB*, 100 F.4th 994, 1004 (9th Cir. 2024) (O'Scannlain, J. concurring).  *See generally* Zev Eigen and Sandro Garofalo, *Less is More:  A Case for Structural Reform of the National Labor Relations Board*, 98 MINN. L. REV. 1879, 1887-92 (2014) (describing the NLRB's "flip flop problem" wherein "newly constituted Boards have made a practice of overruling precedent created by past administrations' Boards, with each Board instituting its own set of politically-motivated rules").

The NLRB's inability to consistently interpret and apply the terms of its own statute is damning evidence of its lack of expertise.  As one court observed, the NLRB's so-called "[e]xpertise [falls] to the wayside and serves as the smokescreen for political influence." *Valley Hosp. Medical Ctr.*, 100 F.4th at 1004 (quoting Amy Semet, *Political Decision-Making at the National Labor Relations Board:  An Empirical Examination of the Board's Unfair Labor Practice Disputes Through the*

---

[13] *See Lutheran Heritage Village-Livonia*, 343 NLRB 646 (2004); *The Boeing Co.*, 365 NLRB 1494 (2017); *Stericycle, Inc.*, 372 NLRB No. 113 (2023).

*Clinton and Bush II Years*, 37 BERKELEY J. EMP. & LAB. L. 223, 292 (2016)); *see also* Transcript of oral argument at 74, *Loper Bright Enter. v. Raimondo*, 144 S.Ct. 2244 (2024) (No. 22-451) (Justice Kavanaugh noting that NLRB "moves from pillar to post fairly often").[14]  The ability to read the political wind should not be confused with "expertise."

Finally, even if the Court were to ignore the NLRB's record, NLRB members still could not claim that they are experts, as they simply interpret the NLRA.   The Supreme Court has made it clear, however, that no agency can claim special expertise in legal interpretation.  Rather, as explained in *Loper Bright Enter.*, 144 S.Ct. at 2267, administrative agencies enjoy no greater competence in interpreting the law than Article III courts.  It therefore stands to reason that the NLRB cannot claim "expert" status simply based on familiarity with its own statute and caselaw. If that were true, every agency would be expert, and the expert requirement of the *Humphrey's Executor* exception would be superfluous.

> **c.     *Humphrey's Executor does not apply because it dealt with different removal protections.***

Further, in *Humphrey's Executor*, the President could remove the principal officers for "inefficiency, neglect of duty, or malfeasance of office."  *Seila Law*, 591

---

[14] Available at https://www.supremecourt.gov/oral_arguments/argument_transcripts/2023/22-451_114p.pdf.

U.S. 215-16. In contrast, NLRB members are protected from removal by unusually strict limitations, providing for removal only for "neglect of duty or malfeasance in office"—not even inefficiency—and "for no other cause." 29 U.S.C. § 153(a). Eliminating the President's ability to remove principal officers for inefficiency would unjustifiably expand *Humphrey's Executor*. *See Collins v. Yellen*, 594 U.S. 220, 256 (2021) ("The President must be able to remove not just officers who disobey his commands but also those he finds 'negligent and inefficient'") (quoting *Myers*, 272 U.S. at 135).

> **d.     *Consumers' Research v. Consumer Product Safety Commission does not apply to the NLRB.***

Defendants contend that the plain language of *Humphrey's Executor* does not apply to them, relying on *Consumers' Research v. Consumer Product Safety Commission*, 91 F.4th 342 (5th Cir. 2024), cert denied, 2024 U.S. Lexis 4374 (Oct. 21, 2024). As applied by Defendants, *Consumers' Research* replaces *Humphrey's Executor*'s "substantial executive power" and "multimember expert agency" limitations with a superficial review of an agency's history and structure. They cannot, however, eliminate *Humphrey's Executor*'s prerequisites for finding an exception to the Constitution's removal provision. *See United States v. Dabeit*, 231 F.3d 979, 984 (5th Cir. 2000) ("This court has a duty to follow precedent, especially Supreme Court precedent."). But even if they could, Defendants' argument fails. *Consumers' Research* addressed a different agency with a different structure. The

NLRB is unique in that its members, in addition to adjudicating unfair labor practice cases, exercise considerable prosecutorial power to enforce the NLRA alongside the general counsel.

The significance of this unique structure is demonstrated by *Exela Enterprises Solutions, Incorporated v. NLRB*, 32 F.4th 436 (5th Cir. 2022). In that case, this Court held that the *Humphrey's Executor*'s exception would not extend to the NLRB general counsel in part because the prosecutorial functions of the office were "core to the executive function." *Id.* at 443-44. But as previously noted, NLRB members possess and exercise this same prosecutorial authority to enforce the NLRA under 29 U.S.C. § 155, which gives them the ability to "prosecute any inquiry necessary to its functions in any part of the United States," 29 U.S.C. § 160(a), and 29 U.S.C. § 160(j), which empowers them to seek injunctive relief in federal court. Because NLRB members possess and exercise the same type of "core" prosecutorial authority as the NLRB general counsel, *Exela*'s holding applies to them in equal measure. Defendants' reliance on *Consumers' Research* is therefore misplaced, especially when *Exela* provides Fifth Circuit precedent that is specific to the NLRB.[15]

---

[15] Another material difference is that the CPSC is truly an expert agency within the meaning of *Humphrey's Executor*. To perform its mission—regulating unsafe products—the CPSC gathers statistical risk data, compiles reports, and educates the public through regular reports. *See* Federal Trade Commission, *Annual Reports to Congress Pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976* (last visited Nov. 29, 2024), https://www.ftc.gov/policy/reports/annual-competition-reports. The CPSC backs up its enforcement efforts with research and expertise

Thus, Findhelp is also likely to succeed on the merits of its argument that—in addition to NLRB ALJs—NLRB members are also unconstitutionally insulated from removal.  The district court's preliminary injunction should be upheld on that basis as well.

### 3.    Defendants' causation argument is meritless.

Defendants next argue that these constitutional shortcomings are of no moment because, under *Collins* and *Community Financial Services Association of America, Limited v. CFPB*, 51 F.4th 616 (5th Cir. 2022), Findhelp has not shown prejudice traceable to the challenged removal protections.  This argument is meritless.  Worse, its logic would wholly insulate government agencies from any meaningful challenge to unconstitutional removal restrictions.

To begin with, neither *Collins* nor *CFSA* apply to the facts of this case.  In both cases, the plaintiffs raised removal arguments to invalidate past agency actions.  In *Collins*, the plaintiffs sought to void a Federal Housing Finance Agency ("FHFA") policy that altered how private shareholders of Fannie Mae and Freddie Mac are compensated when the companies make a profit, based on the FHFA director's

---

independent of its familiarity with its own statute and precedent.  *See* 15 U.S.C. § 2051(b)(4) (goal of CPSC is to "promote research and investigation into the causes and prevention of product-related deaths, illnesses, and injuries"); 15 U.S.C. § 2054 (directing CPSC to conduct studies, research, and investigations of risks to consumers as well as product tests to inform its safety standards).  As described above, the same cannot be said about the NLRB.

protection from at-will removal.  594 U.S. at 252.  After oral argument, the FHFA

agreed to amend the policy, which mooted any claim for forward-looking declaratory

relief.  *Id.* at 223.  As a result, "the only remaining remedial question," the Supreme

Court explained, "concern[ed] retrospective relief"—specifically, whether past

payments under the former policy had to be undone.  *Id.* at 257.  The Court declined

to grant this relief automatically, stating it depended on whether the removal restriction

"altered" the government's behavior in enacting the policy.  *Id.* at 260.  Meanwhile, in

*CFSA*, the plaintiffs sought to vacate the 2017 Payday Lending Rule promulgated by

the Consumer Financial Protection Bureau because the agency's director was

unconstitutionally protected from removal.  51 F.4th at 63.

Unlike *Collins* and *CFSA*, Findhelp is not seeking to "rewind" any of the

NLRB's past actions.  *Collins*, 594 U.S. at 274 (Kagan, J. concurring).  Instead,

Findhelp is seeking a forward-looking remedy, one which will stop an unconstitutional

proceeding before it can take place.[16]  This is precisely the type of relief addressed by

the Supreme Court in *Free Enterprise Fund*, 561 U.S. at 513, which held that plaintiffs

---

[16] In fact, the government embraced this distinction between prospective and
retrospective relief in *Collins* itself.  While it urged the Supreme Court not to
"unravel a multibillion-dollar contract . . . that was in no way tainted by any
constitutional problem," the government emphasized that its position did "not
undercut" the portion of the "judgment awarding a declaration that FHFA's structure
violates the Constitution" and that the removal restriction should therefore be
severed going forward."  *Collins*, Reply and Response Brief for the Federal Parties,
Case No. 19-422, ECF 29.

challenging removal restrictions are "entitled to declaratory relief sufficient to ensure that the [administrative] requirements and . . . standards to which they are subject will be enforced only by a constitutional agency accountable to the Executive."  As the Court explained in *Axon Enterprise, Incorporated v. FTC*, 598 U.S. 175, 191 (2023), the ability to obtain such forward-looking relief is essential because being subjected "to an illegitimate proceeding . . . is impossible to remedy once the proceeding is over."[17]

Defendants' reading of *Collins* and *CFSA* cannot be harmonized with *Axon*, which was decided after those two cases.  Unlike *Collins* and *CFSA*, *Axon* addressed the same question as presented here: whether a party could be subjected to an agency proceeding where the agency decisionmakers are unconstitutionally insulated from removal.  The Court drew a clear line of demarcation between a challenge to actions

---

[17] Defendants cite *FTC v. U.S. Anesthesia Partners, Incorporated*, No. 24-20270 (5th Cir. 2024) to suggest that this Court has cabined *Axon* to the issue of federal court jurisdiction.  (NLRB Brief at 36.)  However, the issues presented in *U.S. Anesthesia Partners* are quite different than those presented in *Axon* and here. Unlike *Axon* and this case, which involve claims of being tried before illegitimate tribunals, the plaintiff in *U.S. Anesthesia Partners* argued that the FTC was required to initiate proceedings in its own administrative courts before proceeding to federal court.  *Id.* at slip op. 7.  In other words, the plaintiff was arguing "not that it has a 'right not to be tried,' but a right to be tried first in a different, additional forum." *Id.*  Significantly, the Court based its decision on the fact that the plaintiffs' claim "does not demonstrate that its challenge to the structure of the FTC will be 'unreviewable' from a final order."  *Id.*  That is not the case here.

taken in the completed agency proceedings (i.e., *Collins* and *CFSA*) and a challenge to

any agency's "power to proceed at all" (i.e., the present case):

> The harm Axon and Cochran allege is "being subjected" to
> "unconstitutional agency authority" — a "proceeding by an
> unaccountable ALJ." That harm may sound a bit abstract;
> but this Court has made it clear that it is a "here and now
> injury." *And — here is the rub — it is impossible to remedy
> once the proceeding is over, which is when appellate review
> kicks in . . . . The court of course could vacate the FTC's
> order; indeed, Axon would have the same claim it won
> before the agency. The claim, again, is about subjection to
> an illegitimate proceeding, led by an illegitimate
> decisionmaker.*

*Axon*, 598 U.S. at 191 (cleaned up, citations omitted, and emphasis added). The notion

that being subjected to an unconstitutional agency proceeding constitutes a "here and

now injury" is derived from *Seila Law*, which pre-dated *Collins*. 591 U.S. at 212

(rejecting "the argument that consideration of the effect of a removal provision is not

ripe until that provision is actually used," because when such a removal provision

violates the separation of powers, it inflicts a "here and now" injury on affected third

parties that cannot be remedied by a court).

 *Axon* does not discuss *Collins.* This is because the two cases addressed different

issues: the plaintiffs in *Axon* were seeking prospective relief, while the plaintiffs in

*Collins* were seeking retrospective relief. The only conclusion that can be reached

from *Axon*'s failure to reference *Collins* is that *Collins* was neither controlling nor

informative on the question of whether a party was entitled to *prospective* relief when proceeding before an unconstitutional tribunal.

If the Court were to adopt Defendants' reading of *Collins*, it would make *Axon*'s holding about "harm" to a party meaningless. The NLRB claims that, even though *Collins* was dealing only with retrospective relief, the Court intended its holding to also apply to claims for prospective relief. But the same Supreme Court Justices who decided both *Collins* and *Axon* never indicated that, and the quoted language from *Axon* above (which was decided after *Collins*) makes it all but certain that they never intended to. If the Supreme Court in *Axon* intended for parties to also show that the President had expressed a desire for removal as a prerequisite for injunctive relief, it would have said so. It did not.

The en banc Fifth Circuit reached the same conclusion in *Cochran v. Securities & Exchange Commission*, 20 F.4th 194 (5th Cir. 2021), *aff'd and remanded sub nom. Axon Enterprise, Incorporated*, 598 U.S. 175 (2023).[18] There, this Court rejected the SEC's attempt to apply *Collins* to block an administrative proceeding before it happened. *Cochran* explained that the *Collins* causal harm requirement does not apply when, as here, the plaintiff "seeks administrative adjudication untainted by separation of powers violations" and "does not seek to 'void' the acts of any agency official." *Id.*

---

[18] *Cochran*'s appeal was considered together with an appeal from *Axon*.

at 216 n.16.  This makes sense, because a plaintiff's "only hope for meaningful judicial review" for a claim like the one here is through a pre-enforcement lawsuit.  *Id.*

Further, applying *Collins* to require an additional showing of harm for removal protection claims would conflict with *Collins* itself.   *Collins* found merit to the plaintiffs' claim that "the removal restriction violates the Constitution" *before* discussing causal harm, and never indicated that causal harm was itself an element of the claim.  594 U.S. at 257.  That is consistent with *Free Enterprise Fund*, which held that a person who brings a pre-enforcement challenge to an agency adjudicator's removal protections is "entitled to declaratory relief sufficient to ensure that the [administrative requirements] will be enforced only by a constitutional agency accountable to the Executive."  561 U.S. at 513.  *See also Cochran*, 20 F.4th at 233 (Oldham, J., concurring) ("A person subject to an unconstitutional adjudication should at least be able to sue for declaratory relief requiring a constitutionally structured proceeding.").

Finally, applying *Collins* to cases involving forward-looking relief would effectively foreclose challenges to unconstitutional removal restrictions because the evidentiary threshold would be nearly impossible to satisfy.  This outcome conflicts with the Supreme Court's stated goal of "creat[ing] incentive[s] to raise" structural challenges to unconstitutional provisions.  *Lucia v. SEC*, 585 U.S. 237, 251 n.5 (2018); *see also Freytag v. CIR*, 501 U.S. 868, 879-80 (1991) (explaining that "the

federal judiciary" possesses a "strong interest . . . in maintaining the . . . separation of powers" because it protects "the entire Republic").  If removal protections are virtually unchallengeable, officers will be less accountable to the President, and Congress will be encouraged to create more unconstitutional protections across the bureaucracy.  Without a Presidential statement, nothing would stop Congress from passing the same type of removal restrictions that were struck down in *Free Enterprise Fund*, *Seila Law*, and *Collins*.

Thus, all pertinent authority demonstrates that *Collins*' "traceable injury" requirement does not apply here, where Findhelp seeks prospective relief, and therefore does not defeat the likelihood that Findhelp will succeed on the merits of its unconstitutional-removal claims.

### 4.     Severance is not an option in this case.

Defendants suggest that—even if there is some truth to Findhelp's position that Defendants' proceedings are unconstitutional—the district courts could have simply severed "any statutory removal restrictions found unconstitutional [to] remedy the alleged violations."  (NLRB Brief at 54.)  They fail, however, to explain what this would look like.  In reality, the issue of severance in these cases is not so simple and necessitates a preliminary injunction pending a final and reasoned determination.

To begin with, severability is relevant to the nature of the remedy at final judgment—not to whether Findhelp is entitled to preliminary injunctive relief pending litigation of the merits of its claim. *See Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328 (2006) (severability is "a question of remedy"). As explained in *Doran v. Salem Inn, Incorporated*, 422 U.S. 922, 931 (1975), parties seeking declaratory relief are still entitled to a preliminary injunction because "prior to final judgment there is no established declaratory remedy comparable to a preliminary injunction; unless preliminary relief is available upon a proper showing, plaintiffs in some situations may suffer unnecessary and substantial irreparable harm." Thus, even if the removal provisions here ultimately could be severed at final judgment without otherwise affecting the NLRB's operations, this possibility does not undermine Findhelp's likelihood of success on the merits of its constitutional claims or its demonstration of irreparable harm.

But even more fundamentally, even if there were such a thing as preliminary declaratory relief, that would not be appropriate here. The Supreme Court has instructed that the "inquiry in evaluating severability is whether the statute will function in a manner consistent with the intent of Congress" if the invalid portion alone is voided. *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 685 (1987). The inquiry, contrary to what Defendants suggest, is not merely whether the statute still works after the offending provisions are removed; courts still cannot sever statutory

language if "rewrit[ing] [the] statute" would "give it an effect altogether different from that sought by the measure viewed as a whole." *Murphy v. NCAA*, 584 U.S. 453, 481-82 (2018).

With regard to the NLRB's ALJs, it is doubtful that the Court could modify the relevant statutory provisions consistent with Congressional intent. The Court in *Lucia* recognized that "[t]he substantial independence that the Administrative Procedure Act's removal protections provide to administrative law judges is a central part of the Act's overall scheme." *Lucia*, 585 U.S. at 260 (Breyer, J., concurring in the judgment in part). Indeed, that was not always the case. Before 1946, ALJs were "employees of an agency" under the Classification Act of 1923 and, as such, their compensation and promotion depended on their agency bosses. *Ramspeck v. Fed. Trial Examiners Conf.*, 345 U.S. 128, 130 (1953) (citing 5 U.S.C. § 661 et seq.). This dependence produced "[m]any complaints" that "they were mere tools of the agency concerned and subservient to the agency heads." *Id.* at 131. This was seen as incompatible with the "independent judgment" necessary for a "fair and competent hearing." *Butz v. Economou*, 438 U.S. 478, 513-14 (1978).

These complaints led Congress to hold "extensive hearings" where it evaluated "[s]everal proposals" for how to best solve this problem. *Ramspeck*, 345 U.S. at 131-32. Ultimately, Congress settled on enacting the APA in 1946, which made ALJs "removable by the agency in which they are employed only for good

cause established and determined by the Civil Service Commission."  Administrative Procedure Act, Pub. L. No. 79-404, sec. 11, 60 Stat. 237 (1946).  But the members of the Civil Service Commission were still removable at will by the President, *see* 5 U.S.C. § 632 (1946), which led to more complaints that the Commission could be unduly pressured by the President.  Civil Service Reform: Hearings on H.R. 11280 Before the H. Comm. on Post Off. & Civ. Serv., 95th Cong. 824 (1978).

As a result, this single layer of for-cause protection was altered in 1978 when Congress created the Merit Systems Protection Board ("MSPB").  *See* Civil Service Reform Act of 1978, Pub. L. No. 95-454, sec. 1202(d), 92 Stat. 1111 (1978).  The Act provided that members of the MSPB "may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office," 5 U.S.C. § 1202(d), while maintaining that an agency may remove an ALJ "only for good cause established and determined by the [MSPB]," 5 U.S.C. § 7521(a).  Thus, from 1978 forward, Congress imposed the multiple layers of for-cause removal protection that now shields ALJs from Presidential control.

This history demonstrates that Congress considered all the removal restrictions essential to the statutory scheme.  Congress considered it vital that ALJs be viewed as neutral adjudicators, not "mere tools" of their political superiors.  It therefore demanded that members of the MSPB have an independence "akin" to that of federal judges.  *See* Civil Service Reform: Hearings on H.R. 11280 Before the H.

Comm. on Post Off. & Civ. Serv., 95th Cong. 824 (1978) (Congress sought to "confer upon [MSPB] members a tenure akin to that of the Federal judiciary"). Unsurprisingly then, the Civil Service Reform Act of 1978 lacks a severability clause instructing courts to save whatever they can if any of these key removal restrictions falls. *See* Pub. L. No. 95-454. Indeed, the only other remedial possibilities— "tamper[ing] with" one of the restrictions, *United States v. National Treasury Employees Union*, 513 U.S. 454, 478 (1995)—would rewrite Congress's carefully crafted scheme."[19]

Thus, the "solution" posed by amicus AFL-CIO—to temporarily enjoin an ALJ from relying on the removal protections of 5 U.S.C. § 7521(a) during the pendency of the ULP trial [ECF 63 at 22]—is no solution at all.[20] It would turn the

---

[19] There can be little question that ALJs' decisional independence and freedom from agency coercion was a priority for Congress. In *SEC v. Jarkesy*, 144 S.Ct. 2117 (2024), the government insisted that the "[i]nvalidat[ion of] tenure protections for ALJs" "would thwart Congress's efforts to promote the actual and perceived fairness of agency adjudications." Brief of Petitioner Securities and Exchange Commission at 65 [Case No. 22-859 ECF no. 24] (formatting altered). As the Solicitor General explained, such an approach would "recreate the problems that the APA was meant to solve, thereby undermining both the 'fairness' of agency hearings and 'public confidence in that fairness.'" *Id.* at 66 (quoting *Wong Yang Sung v. McGrath*, 339 U.S. 33, 42 (1950)).

[20] As noted in *Space Exploration Technologies Corporation v. NLRB*, Civil No. W-24-CV-00203-ADA, 2024 U.S. Dist. Lexis 129439, at *15 (W.D. Tex. July 23, 2024), the "NLRB ALJ conducting the administrative proceedings against SpaceX has three sets of removal protections . . . ." The suggestion to temporarily eliminate ALJs' MSPB rights still leaves them with an impermissible two layers of protection.

ALJ back into an agency minion that Congress repudiated when it passed the APA. Indeed, this solution would make the problem worse because the non-independent adjudicator would still wield the additional powers Congress granted him/her on the presumption of federal-judge-like independence.

In addition to ALJs, severance is also not an option as applied to the unconstitutional removal protections for NLRB members. Congress designed the NLRB to be an independent agency free from undue presidential or political influence. *See Space Expl. Techs. Corp.*, 2024 U.S. Dist. Lexis 129436, at *15-16; Irving Bernstein, The New Deal Collective Bargaining Policy 90, 93 (1950). Congress made it so in response to the perceived ineffectiveness of the National Labor Board, created under the National Industrial Recovery Act, which relied on the Justice Department (which answered directly to the President) to enforce its orders. *See* Michael Heilman, *The National Labor Relations Act at Fifty: Roots Revisited, Heart Rediscovered*, 23 DUQ. L. REV. 1059, 1069 & n.89 (1985). Severing NLRB members' removal protections would contravene Congress's intent.

The NLRB's reliance on *Seila Law* and *Free Enterprise Fund*, where the Supreme Court severed unconstitutional removal restrictions, does not alter this analysis. In those cases, the PCAOB and CFPB were new agencies created to fill perceived regulatory voids. Although Congress evidently preferred those agencies also to be independent, unlike here there was no basis to conclude that Congress had

affirmatively considered alternative options that would have achieved its goals better. *See Seila Law*, 591 U.S. at 236; *Free Enter. Fund*, 561 U.S. at 509. The Court recognized that other options might exist, but those were merely "theor[etical]" possibilities, not real-world reasons to conclude that Congress would have opposed severance. *Free Enter Fund*, 561 U.S. at 509-10.

In sum, unlike in other severability cases involving removal restrictions that Defendants cite, here it is not clear whether "Congress, faced with the limitations imposed by the Constitution, would have preferred" an officer "removable at will" to "no [officer] at all." *Seila Law*, 591 U.S. at 234 (quoting *Free Enter Fund*, 561 U.S. at 509). The Court may not "circumvent the intent of the legislature." *Ayotte*, 546 U.S. at 320, 330. Nor may it engage in "judicial legislation." *United States v. National Treasury Employees Union*, 513 U.S. at 479. Thus, this Court should resist Defendants' invitation to reflexively rewrite these statutes at the preliminary injunction stage.

### C.     The District Court Permissibly Determined that Findhelp Would Suffer Irreparable Harm in the Absence of Preliminary Relief.

The Fifth Circuit and the Supreme Court made clear in *Cochran* and *Axon* that being subject to a proceeding before an improperly insulated ALJ is a cognizable legal injury. These cases also make it clear that, once the administrative proceedings have concluded, there is no chance to remedy the injury: "[a] proceeding that has already happened cannot be undone," and "[j]udicial review . . . would come too late

to be meaningful." *Axon*, 598 U.S. at 191.  If that is not irreparable injury warranting injunctive relief, nothing is.

Defendants first suggest that unconstitutional removal provisions are not that important, and that harm exists only when "individual rights," such as First Amendment and privacy rights, are implicated.  (NLRB Brief at 49-51.)  But they offer no reason for distinguishing between the harm posed by those different constitutional injuries.  Moreover, the cases Defendants rely upon do not support their position.  For example, *Delaware State Sportsmen's Association Incorporated v. Delaware Department of Safety & Homeland Security*, 108 F.4th 194, 205 (3rd Cir. 2024), states that injunctions are appropriate when "required to preserve the status quo while litigation is pending" and when the movant is suffering "harms beyond ones that can be cured after final judgment."  That is the case here.  Without an injunction, the administrative proceeding will move forward and, in the words of *Axon*, "cannot be undone" and will be "impossible to remedy once the proceeding is over."[21]

---

[21] In contrast, cases cited by Defendants for the proposition that there exists a "distinction between individual rights and other constitutional issues" either did not involve the type of concrete injury presented in this case or could readily be remedied through monetary relief.  *See Sheffield v. Bush*, 604 F. Supp. 3d 586 (S.D. Tex. 2022) (in eminent domain action, plaintiffs' fear that their privacy would be invaded by others coming onto their property was speculative); *Chambless Enters., LLC v. Redfield*, 508 F.Supp.3d 101 (W.D. La. 2020) (injury caused by order precluding landlord's ability to enforce a single lease provision for non-payment of rent, on a temporary basis, could be remedied with monetary damages); *Lambert v.*

Defendants also rehash their *Collins* "causal harm" and *Axon* "subject-matter jurisdiction" arguments.  To the extent it is not already clear from the above discussion, it defies logic to suggest that harm for purposes of determining standing is any different than harm for purposes of determining availability of relief.  Harm is harm.

Findhelp is at least entitled "to declaratory relief sufficient to ensure that the requirements and . . . standards to which it is subject will be enforced only by a constitutional agency accountable to the Executive." *Free Enter. Fund*, 561 U.S. at 513.  Even if the Court were to ultimately conclude that Findhelp was entitled only to declaratory relief at final judgment (as opposed to a permanent injunction), a preliminary injunction is needed in the interim to prevent irreparable injury and preserve the status quo so that the Court can provide meaningful final relief before final judgment.  *See, e.g.*, *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975); *Wenner v. Tex. Lottery Comm'n*, 123 F.3d 321, 326 (5th Cir. 1997).

### D.     The District Court Permissibly Held that the Balance of Equities and Public Interest Favor a Preliminary Injunction.

This Court has made it clear that there is no public interest in favor of enforcing unlawful and unconstitutional government action.  *Wages & White Lion*

---

*Bd. of Comm'rs*, No. 05-5931, 2006 U.S. Dist. LEXIS 105067, at \*23 (E.D. La. Mar. 22, 2006) (injury caused by refusal to allow access to vessels after Hurricane Katrina could be remedied with monetary damages).

*Invs., L.L.C.*, 16 F.4th 1130, 1143 (5th Cir. 2021); *see also BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021) (emphasizing that "enforcing an unlawful" law or agency action is an "illegitimate" interest).   On the contrary, the "public interest is in having governmental agencies abide by the federal laws that govern their existence and operations."   *Tex. v. Biden*, 10 F.4th 538, 559 (5th Cir. 2021) (quotation omitted).   "And 'there is generally no public interest in the perpetuation of unlawful agency action.'"   *Id.* at 560 (alteration omitted) (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)); *see also Daniels Health Scis., LLC v. Vascular Health Scis., LLC*, 710 F.3d 579, 585 (5th Cir. 2013) (noting that "the public interest is served when the law is followed").

Defendants urge the Court to ignore these fundamental principles, arguing that the public interest in enforcing the policies of the NLRA should override any other concern.   In doing so, Defendants wholly discount the vital role separation of powers plays in our constitutional system.   The framers included the Take Care Clause for a reason:

> The people do not vote for the "Officers of the United States."   Art. II, § 2, cl. 2.   They instead look to the President to guide the "assistants or deputies . . . subject to his superintendence."   The Federalist No. 72, p. 487 (J. Cooke ed. 1961) (A. Hamilton).   Without a clear and effective chain of command, the public cannot "determine on whom the blame or the punishment of a pernicious measure, or series of pernicious measures ought really to fall."   *Id.,* No. 70, at 476 (same).   That is why the Framers sought to ensure that "those who are employed in the

> execution of the law will be in their proper situation, and
> the chain of dependence be preserved; the lowest officers,
> the middle grade, and the highest, will depend, as they
> ought, on the President, and the President on the
> community." 1 Annals of Cong., at 499 (J. Madison).

*Free Enter. Fund*, 561 U.S. at 497-98; *see also City of Arlington v. FCC*, 569 U.S. 290, 314-15 (2013) (Roberts, J. dissenting) (Presidential oversight is essential "for the purpose of safeguarding liberty" and preventing a "headless fourth branch of government"). Allowing officers to wield executive power outside of presidential control severs the chain of accountability. *Collins*, 594 U.S. at 251. The result is a system that "allows Presidents to avoid making important decisions or to avoid taking responsibility for decisions made by independent agencies." *In Re Aiken County*, 645 F.3d 428, 444 n.4 (D.C. Cir. 2011) (Kavanaugh, J., concurring).

This is not "our constitutional structure," and absent court intervention, "the liberty of the American people" will suffer. *Seila Law*, 591 U.S. at 239 (Thomas, J. concurring). The public has a significant interest in ensuring that the "growth of the Executive Branch, which now wields vast power and touches almost every aspect of daily life," does not "slip from the Executive's control, and thus from that of the people." *Free Enter. Fund*, 561 U.S. at 499. This danger is particularly acute in removal cases such as this because, absent preliminary injunctive relief, the issue of ALJ removal protections could never be raised, as the administrative proceeding

would conclude before a court could act.  Indeed, if not stopped here, "this dispersion of responsibility could be multiplied."  *Id.* at 498.  As the majority in *Axon* cautioned:

> "[i]f Congress can shelter the bureaucracy behind two layers of good-cause tenure, why not a third? . . . The officers of such an agency--safely encased within a Matryoshka doll of tenure protections--would be immune from Presidential oversight, even as they exercised power in the people's name."

*Id.*

Further, any suggestion that the Constitution must take a backseat to administrative efficiency is misplaced.  The "fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution," for "[c]onvenience and efficiency are not the primary objectives – or the hallmarks – of democratic government."  *Bowsher v. Synar*, 478 U.S. 714, 736 (1986) (quoting *INS v. Chadha*, 462 U.S. 919, 944 (1983)); *see also Alabama Ass'n of Realtors v. Dep't of Health & Human Servs.*, 594 U.S. 758, 766 (2021) (noting "our system does not permit agencies to act unlawfully even in pursuit of desirable ends").  Further, such a notion ignores that it is possible to "have a government that functions without being ruled by functionaries, and a government that benefits from expertise without being ruled by experts."  *Free Enter. Fund*, 561 U.S. at 499.[22]

---

[22] Defendants also argue that the passage of time necessary to resolve this constitutional issue somehow militates against granting the preliminary injunction

Finally, even if the Court grants the injunction but ultimately determines the proceedings are constitutional or corrects the constitutional defects, Defendants could move forward with the unfair labor practice proceeding at that time. The preliminary injunction would merely require the NLRB stay the proceeding while the Court makes it determination. While Findhelp would be deprived of its constitutional rights if forced to proceed, the Defendants would not lose anything were a preliminary injunction granted.

In short, the district court properly found that the balance of equities and public interest support a preliminary injunction halting Defendants' unconstitutional proceedings.

---

because the underlying unfair labor practice claim involves the discharge of three employees. First, the suggestion that a delay to allow the Court to consider these issues somehow harms the public interest rings severely hollow where the NLRB waited over a year – the initial charge was filed on January 30, 2023, and the Complaint was issued on April 12, 2024 – to file its complaint on events dating back to January 2023. (*See* ROA.12-10855.59.) Second, the discharged employees (like all other employees who claim they have been fired in violation of law or contract) have an adequate remedy: backpay. Defendants' claim that the failure to quickly return these employees to work (even assuming they wish to return, which has not been shown) may "chill" other employees from exercising statutory rights is pure speculation unsupported by any record evidence. Indeed, it is contradicted by the undisputed evidence that Findhelp has and continues to bargain with the Union for a collective bargaining agreement. (*See* ROA.12-10855.59-60.) Lastly, if Defendants' enforcement concerns were enough to outweigh Findhelp's ability to vindicate its constitutional rights, no aggrieved party could ever obtain a preliminary injunction, because the government always has this abstract interest.

## <u>CONCLUSION</u>

Findhelp respectfully requests that this Court affirm the district court's preliminary injunction.

Dated: December 11, 2024

Respectfully submitted,

/s/Talley R. Parker
Talley R. Parker
Texas State Bar No. 24065872
talley.parker@jacksonlewis.com
JACKSON LEWIS P.C.
500 N. Akard Street, Suite 2500
Dallas, Texas 75201
(214) 520-2400 – Telephone
(214) 520-2008 - Fax

**ATTORNEYS FOR APPELLEE
AUNT BERTHA, A PUBLIC
BENEFIT CORPORATION
DOING BUSINESS AS FINDHELP**

## CERTIFICATE OF SERVICE

I certify that on December 11, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system.

/s/Talley R. Parker
Talley R. Parker

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), I certify that the foregoing brief contains 12,957 words, as counted by counsel's word processing system, and thus complies with the 13,000-word limit. *See* FED. R. APP. P. 32(a)(7)(B)(i).

This document complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word using size 14 Times New Roman font.

/s/Talley R. Parker
Talley R. Parker